VAN WAGONER et al. v. UNION PAC. R. CO.

No. 6983.   Decided November 3, 1947.   (186 P. 2d 293.)

190

See 50 C. J. S., Juries, sec. 195. Challenge of proposed juror for implied bias or interest because of relationship to one who would be subject to challenge for that reason, see note, 86 A. L. R., 118. See, also, 31 Am. Jur., 661.

*R. Vern McCullough,* of Salt Lake City, and *Don Mack Dalton,* of American Fork, for appellant.

*H. B. Thompson, Bryan P. Leverich, M. J. Bronson,* and *A. U. Miner,* all of Salt Lake City, for respondent.

LATIMER, Justice.

On May 15, 1944, at approximately 6:30 P. M., Dean Van Wagoner, deceased, was driving a Ford pick-up truck south on Fourth West Street in American Fork, Utah. This street runs generally in a north and south direction, and intersects with a single railroad track of the defendant which runs generally in a northeast to southwest direction. The weather was clear, the sun was commencing to set but was shinning brightly, and the road was dry. As the deceased attempted to pass over the crossing, his truck was hit by defendant's engine pulling some thirty-two cars, and he was fatally injured. The appellants in this action are his sole surviving heirs at law, and instituted the action in that capacity. The action was tried before a jury and a verdict of "No cause of action" returned. From the judgment on the verdict, plaintiffs have appealed to this court.

Appellants predicated their right to recover upon the following acts of negligence: (1) Failure to give warning (ring the bell or blow the whistle) ; (2) Failure to keep a proper or any lookout; (3) Failure to maintain a good and sufficient crossing; (4) Operating the train at a high and dangerous rate of speed; and (5) Failure to avoid the collision when by the use of ordinary care the railroad company could have prevented the death of deceased.

It is not necessary to detail the voluminous evidence on all the alleged grounds of negligence. The parties concede that as to certain acts the evidence is conflicting and the jury adequately and correctly instructed. It will therefore

only be necessary to refer to such evidence as is material to the question raised on this appeal.

The following sketch (page 193) of the scene of the accident, taken from an exhibit introduced by the plaintiffs, is included in the opinion for illustrative purposes. The evidence necessary to a proper determination of the questions presented by the appeal will be referred to under the appropriate discussion.

The parties to the action have argued the assignments of error under six propositions, and these will be treated in the order presented, with the exception of proposition Number Six. A discussion of this one is not necessary in view of the fact that it raises the question of whether or not the court erred in limiting appellants in their right to recover certain elements of damage. The jury having rendered a verdict in favor of the respondent, the instruction, if erroneous, did not prejudice the appellants' cause.

Appellants' first assignment of error raises the question as to whether or not the court erred in denying appellants' challenge of a juror for cause. Mr. Melvin Hurd was an adjuster for the respondent railroad company, and made an investigation of the particular accident involved. In connection with this investigation, he took a number of photographs, made numerous measurements and interviewed a number of witnesses. At the time of the trial, he was still employed by the respondent, and testified as a witness for the company. His mother, Mrs. W. C. Hurd was a member of the jury panel, and was one of the jurors selected for duty in this action. During her examination she disclosed her relationship, with the adjuster, and was questioned at some length by the trial judge and by appellants' attorney. Without quoting in detail, the record indicates she made a full and fair disclosure of her attitude toward the parties and expressed a willingness to carry out her duties, if selected as a juror, and render a fair and impartial verdict based on the evidence introduced and instructions as given by the court. She had no actual bias toward either of the parties, but did express a normal mother's feeling towards

the honesty and integrity of her son. Under questioning of appellants' counsel, she testified in substance that she would place more credence in and give more weight to her son's testimony than she would to that of a stranger; that it would likely take more testimony to overcome her son's testimony than it would if a stranger had been the investigator and witness; that even if two witnesses testified contrary to her son's testimony she would believe her son; and that it would take considerable evidence to remove the belief that her son was telling the truth. Under further questioning of the court and counsel, she stated: that she could render a verdict against the company fairly and impartially; that she felt it a duty to serve as a juror and would try to be fair and just in her deliberation; that she could evaluate her son's testimony and if she did not believe it was right she would form her own opinion to the contrary, and that she would be fair to both parties and render a fair and impartial verdict.

It is admitted that a litigant is entitled to a trial before an impartial and disinterested jury and each party must be given a reasonable opportunity to submit his cause to eight jurors, each of whom has an unbiased and unprejudiced mind. However, this right extends only to the jury finally selected to try the case. For this reason it is not necessary for this court to determine Mrs. Hurd's qualification to sit as a juror, as she was not finally selected, and took no part in the deliberations. She was excused because of a peremptory challenge exercised by appellants. It is, however, necessary to pass on appellants' contention that they were required to use one of their peremptory challenges to remove Mrs. Hurd, and therefore were unable to challenge another juror who was objectionable to them.

Appellants vigorously objected to the trial judge's ruling on the challenge of Mrs. Hurd for cause, but made no complaint to the trial court that the jury as finally selected had, as a member, any juror who was objectionable to them. No showing was made that appellants desired to exercise any more peremptory challenges than were used and for aught

that appears, they were satisfied with the jury. Having failed to notify the trial judge that further challenges were desired, this court, if it were to sustain appellants' contention, would be required to presume prejudice without a showing that the appellants intended to or would have exercise more than the three peremptory challenges allowed them by statute, or the two afforded them if one were, in effect, denied.

This court has repeatedly held that unless all peremptory challenges are exhausted, an error in ruling on a challenge for cause is no ground for reversal. The reason prompting such a holding is that the complaining party has not been prejudiced by the ruling. The objectionable juror has been removed and the jury accepted within the number of peremptory challenges permitted by statute. The same reason can be applied to the case at bar. Here too, Mrs. Hurd was removed and if the appellants felt that by using a peremptory challenge to remove her they were denied a peremptory challenge that they would otherwise have used on some other objectionable juror, then they should have so informed the trial judge. Not having done so, they are not now in a position to claim the trial court required them to accept an objectionable juror. From the record before us, appellants, prior to taking of evidence, were satisfied with the jury as finally selected within the limits of their peremptory challenges. Should this court now permit them to say they would have used a peremptory challenge on one of the remaining jurors had the trial court excused Mrs. Hurd for cause? They make the contention in this court that they would have done so, but to permit the question now to be raised, would allow a party to willingly accept a jury before verdict and then claim error in this court because of an adverse verdict. If an erroneous ruling on a challenge for cause has the effect of depriving a party of a peremptory challenge, this court will not review the ruling unless the deprivation was of a challenge that the record affirmatively shows would have been used. To make

this showing to the trial judge before the jury is sworn is a burden we place on the complaining party.

In the early case of *Conway* v. *Clinton,* 1 Utah 215, this court reversed a judgment because disqualified jurors were permitted to sit. The majority opinion based its decision on the fact that two jurors should have been removed for cause, that appellant had used all but one peremptory challenge and that he could not therefore have removed all disqualified jurors. In addition to the two jurors remaining on the jury, appellant in his assignment of error questioned the trial court's ruling on another juror, concerning which juror the court said:

"In impaneling of the jury, George W. Scott was challenged for cause by the Defendants, and the challenge denied, which is assigned as error. It appears, however, that he was subsequently challenged peremptorily by the same party, and was not sworn as a juror. Whether therefore, the challenge was properly denied or not, as he did not serve as a juror, the Defendant was not prejudiced by the ruling, and the assignment of error cannot be sustained. *Mimms* v. *State,* 16 Ohio St. 221."

This contention that prejudice is presumed from an erroneous ruling in a challenge for cause when all peremptory challenges have been exhausted was raised by appellants in the case of *State* v. *Thorne,* 41 Utah 414, 426, 126 P. 286, 291, Ann. Cas. 1915D, 90, and was overruled. Said this court:

"* * * In some jurisdictions it is held that in case the defendant is required to remove a juror by a peremptory challenge, when such juror should have been removed upon a challenge for cause, if one was properly interposed, and that where, as here, the defendant exhausts his peremptory challenges before the entire jury is selected, in such a case, error is presumed, and the defendant is entitled to a new trial. *People* v. *Weil,* 40 Cal. 268. Other courts many years ago, as we shall see, have arrived at a contrary conclusion.

"Thompson & Merriam on Juries, published in 1882, in referring to this subject say: 'Will the law presume prejudice from the simple fact that the peremptory challenges were exhausted? Some courts answer this question in the affirmative; but, in the opinion of others, something more must be shown, namely, that after the

peremptory challenges were exhausted some objectionable person took his place upon the jury, who would otherwise have been excluded by a peremptory challenge. The latter seems to be the better view. Conceding the challenge for cause to have been improperly overruled, it is evident that only under such circumstances as just stated can the loss of the peremptory challenge, necessary to cure the erroneous decision of the court, be said to have worked an injury to the challenging party—.'

"* * * The whole question of whether there is prejudicial error therefore turns upon whether prejudice will be presumed from the mere fact that the appellant was compelled to exercise one of his peremptory challenges to remove a juror whom he had challenged for cause, and who should have been removed upon the latter challenge, or whether, in order to show prejudicial error, the appellant must make it appear that an objectionable juror was forced upon him after his peremptory challenges were exhausted, and whom he would have removed from the panel by challenging him peremptorily if his challenges had not been exhausted, as aforesaid. If prejudice is presumed, it must be based upon the mere fact that the appellant was required to remove a juror by the exercise of one of his peremptory challenges, when the juror should have been removed upon the challenge for cause. To follow such a course is to lose sight of the fact that all that one who is on trial for a crime is entitled to is a fair and impartial jury, and that the right of challenge is given for the sole purpose of reaching that result. * * *"

While the procedure for finally selecting jurors now used in trial courts is different from that used when the *Thorne* case was decided, the reasoning in that case is persuasive.

This court in the case of *State* v. *Cano*, 64 Utah 87, 101, 228 P. 563, 568, announced the following rule with respect to the question at hand:

"It is further contended that the district court erred in denying several of defendant's challenges to several jurors for cause. The record does not disclose whether the defendant exhausted all of his peremptory challenges or not. The record does, however, show that the objectionable jurors were all eliminated from the panel, and did not sit in the trial of the case. It is quite clear that no prejudice resulted from any of the court's rulings in that regard."

Evidently in the *Cano* case this court concluded that the test was prejudice. While the record was silent as to the exhaustion of all peremptory challenges the court held this

to be immaterial as the objectionable jurors were removed. Here too, the objectionable juror was removed.

The Supreme Court of California in the case of *People* v. *Craig*, 196 Cal. 19, 235 P. 721, 723, passed on this identical question. Said the court:

"* * * By all of the authorities of this state touching like situations the rule is that an erroneous disallowance of a challenge for cause is not prejudicial, even though the defendant finally exhaust his peremptory challenges, if it does not appear that he had occasion to or desired to use an additional peremptory challenge, or that the jurors finally accepted were not entirely satisfactory to him. *People* v. *Kromphold*, 172 Cal. 512, 157 P. 599; *People* v. *Schafer*, 161 Cal. 573, 119 P. 920; *People* v. *Harrison*, 18 Cal. App. 288, 123 P. 200; 8 Cal. Jur. 610. The above cases state the precise situation of the defendant in the instant case. In the case of People v. Kromphold, quoting approvingly from People v. Schafer, it is said:

" 'It is entirely consistent with the record that the twelve jurors who actually tried the case were absolutely satisfactory to defendant, and that he desired all of them to serve and would not have excused any of them if he had been given the opportunity. After judgment, the contrary should not be presumed.' "

The case of *Frank* v. *United States*, 9 Cir., 42 F. 2d 623, 631, reviewed the authorities dealing with the right of litigants where an erroneous ruling has been made on a challenge for cause. In that case during the impaneling of the jury defendant interposed a challenge to a juror upon the ground of actual bias. The challenge was denied, the ruling was excepted to, and the juror was then challenged peremptorily and excused. The defendant exhausted the number of peremptory challenges allowed by statute, but did not ask leave of the court to exercise another peremptory challenge. Said the court:

"If the defendant is dissatisfied with the jury or any member of the panel selected to try the case, he should manifest that fact to the trial court, and in the absence of some objection or request to exercise an additional peremptory challenge, he ought not to be heard to complain upon appeal of an error which was corrected by his exercise of a peremptory challenge to the juror challenged for cause. If later he found that because he had thus cured the error of the trial judge, he would be forced to accept an objectional juror whom he could not challenge

for cause he should have called the attention of the trial court to that fact. The injury to him was not sustained by the ruling of the court on the challenge for cause. If he was thereby injured it would be for the reason that after exhausting his peremptory challenges he was thereby required to accept an unsatisfactory juror."

The right of a party to challenge for cause is given for the purpose of permitting litigants to obtain a fair and impartial trial by an unbiased jury. The right to challenge peremptorily is given to permit a litigant some latitude in removing jurors who are not disqualified for cause yet are objectionable to the challenging party. While the law permits some choice in the selection, it does not permit a litigant to have his case heard by a jury of his own choosing. The law seeks to afford both litigants a fair trial. If the jury as finally selected meets the test of being a fair and impartial jury, then the litigants have not been denied their fundamental right. The record in this case does not indicate that any juror selected was biased and prejudiced against the appellants or in favor of the respondent. Neither does it indicate that any juror selected had any mental reservation against rendering a fair and impartial verdict. Both the trial court and the parties had an opportunity to examine the jurors, note the candor and fairness of their answers, observe their demeanor and judge their qualifications to sit as jurors. All were examined and the record indicates that with the possible exception of two, they were all qualified to act. Only two challenges for cause were exercised, and in one instance the juror was excused, while in Mrs. Hurd's case she was not. While a number of the jurors chosen had, over short periods of time, some incidental and remote dealings with the respondent, this court cannot say the jury as chosen did not meet the test of being a fair and impartial jury, and cannot on this record and in the absence of a showing by the appellants in the court below, hold that an objectionable juror was forced upon them by the trial court. Accordingly, this assignment of error is overruled.

The next assignment advanced by appellants concerns the refusal of the trial court to instruct the jury on respondent's alleged negligence arising out of the train crew's failure to keep a proper lookout. If there is any substantial evidence in the record, the court should have submitted plaintiff's theory to the jury, as this court has held that there is a duty upon the railroad company to keep a proper lookout, particularly when approaching a public crossing.

There was no direct evidence that the train crew was not keeping a proper lookout. On the contrary, the train crew testified to facts indicating a reasonable compliance with this requirement. Appellants in this assignment rely principally on the evidence of the witness, Idona Bowers, on the stalling of the truck and the failure to warn; and the evidence of other witnesses on the failure to warn. The substance of the testimony given by Idona Bowers is this. She was 16 years of age, and saw the accident from a position near a tree in her front yard which was approximately 126 feet from the crossing. She was lying on a cot, and her curiosity was first aroused by the noise of the truck coming south on Fourth West Street. The truck continued south until it reached a point approximately one-half the way between the tracks and the driveway into her house, or approximately 65 feet from the track. She noticed the train at this time, and it was just south of the Faddis house. (Shown in sketch.) She could not estimate the distance from the place where she first saw the engine to the crossing, (the map distance shows approximately 440 feet). She was impressed with the fact that there was going to be an accident, and watched both the train and the truck as they continued on their respective courses. The truck proceeded up the incline and when it reached the north rail it appeared to stop. It then went onto the track and appeared to stall for a second or two when it was hit by the engine. She did not hear the bell ringing, and the train whistle was not sounded until the engine was an estimated 14 feet from the crossing. The accident happened very fast and the truck was stalled on the track about a

second or two. The train was travelling about twice as fast as the truck. She was excited because she expected to see an accident. She sat up. The truck was on the track at the time the train had reached a point about halfway between the crossing and the Faddis house.

The evidence in favor of the respondent on this question was as follows: The engineer was on the side away from the approaching truck and did not see it until after the impact. The length of the engine restricts his line of sight to the left. There was a brakeman riding in the cab behind the fireman who saw the truck prior to and after it cleared a long line of trees. When it cleared this line of trees it was some 160 feet north of the crossing. He watched it approach the track, and when it cleared the last tree, which was approximately 25 feet from the crossing he realized it was not going to stop. Upon realizing the truck was not going to stop he gave an emergency signal to the engineer. The fireman did not see the truck until it cleared this last tree, and when he saw it come from behind this tree he also gave an emergency signal.

In addition to the foregoing evidence, there was a sharp conflict in the testimony as to the ringing of the bell and the blowing of the whistle. The conflict was so pronounced, it would be impossible to read the record and determine the ultimate facts. The jury found against appellants and while its findings on each alleged act of negligence is not available, at least this court cannot say the whistle was not sounded and the bell was not ringing, and neither could the trial court.

The testimony most favorable to appellants from which a failure to keep a proper lookout can be inferred, is the statement by Idona Bowers that the truck stalled on the track when the train was half-way between the Faddis home and the crossing. While the witness did not estimate the distance in feet, the map distance shows the half-way mark to be 220 feet from the crossing. This distance must be considered in the light of the witnesses' ability to estimate, her excitement, her relative position to the moving objects,

and her mental consciousness of an accident the first time she saw the truck.

The witness admitted she could not judge speed or distance, but she could compare the relative factors. Her first estimate was that the train was south of the Faddis home and the truck was half-way between the driveway going into her home, and the track. This would place the truck some 65 feet from the crossing, and the train some 440 feet away. Her next estimate was the train was going twice as fast as the truck. If these figures were accepted, by the time the train travelled to the half-way point, or 220 feet, the truck would have cleared the crossing and yet, according to her testimony, the truck stalled at this time. Another part of her testimony is that the truck was only on the track for a second or two. If we were to take the speed of the train as the fastest given by any witness, it would not be going over 75 feet per second, and this would place the engine back 150 feet. Her testimony on the whistling of the train at 15 feet west of the crossing leaves something less than a distance of 150 feet for the crew to appreciate the truck has stalled and get the train stopped. If we were to assume the lowest speed given by witnesses and the time interval as given by Miss Bowers, the train would be 44 feet from the crossing when the truck became stalled.

As has often been said, estimates made by witnesses do not have the accuracy of mathematics, and they are not expected to fix locations or speeds with certainty; however, they are helpful when being considered in connection with explaining or qualifying other evidence given by the same witness. In this case the estimates are based on objects moving from different directions and in this setting exaggerate the most significant testimony given by the witness; that is, she was excited, and from the moment she saw the truck and the train approaching the crossing, she knew there was going to be a collision between the two. Now this feeling could not be based on the fact that the truck would consume time while stalled on the track, but was based on the fact that from her observation of time, distance, and

speed, she knew the two objects would meet if the relative speeds were maintained. Even though a collision was apparent to her when the truck was approaching the track, it may not have been so apparent to the train crew. While both objects were approaching the crossing the crew was entitled to assume the truck would stop until such time as a reasonably prudent person would know otherwise. Under the facts and circumstances of this case, a failure to act in time to avoid a collision does not establish a failure to look.

Even were we to assume the train crew failed to keep a proper lookout, appellants must still fail in their assignment, as assuming the truck was stalled for a couple of seconds; if it is intended to submit this question to the jury, there must be a basis for concluding that the failure to keep a lookout proximately contributed to the accident. No one questions the fact that the crew did bring about an emergency stop, and the application of brakes was made when the train was some 15 feet north of the crossing. In spite of this, it required an additional 457 feet to stop the train. Assuming that when the truck stalled, as testified to by Miss Bowers, and this would be the first opportunity the train crew would have of knowing it was stalled, and assuming further that the engineer saw the truck, could the jury reasonably have found that the collision could have been avoided? Not unless there was sufficient time for the train crew to have stopped the train or, assuming the warning signals not to have been given, to permit these signals to have been given and the deceased to have been warned in time to have jumped clear of the train. A fair reading of the evidence warrants a finding by the trial court that regardless of whether or not the train crew was keeping a lookout, this could not have been a proximate cause of the collision. Because of the weight of the train, the impossibility of stopping within short distances, and the impossibility of turning to avoid objects in its path, the same right of way rule does not apply as in the case of two automobiles. Trains cannot be stopped in time to avoid collisions if the time interval is shortened to a matter of

two seconds, and warnings are of no avail if they cannot be given in time to permit a person to escape from his position of peril.

In treating this subject, consideration must be given to the fact that the court submitted to the jury as one of the grounds of negligence the defendant company's failure to blow the whistle or ring the bell. It is reasonable to conclude how this negligence might proximately contribute to the collision, but if the jury found the whistle was being blown and the bell was ringing, then the keeping of a proper lookout would not have prevented the injury, as the deceased had all the warning that could have been given. If on the other hand, these warnings were not given, with the crew maintaining a proper lookout, deceased would not have been warned of his peril. Under the most strained construction of the facts, the train crew could not have anticipated deceased's presence on the track until the train had reached a point approximately 220 feet from the point of impact, and this was half the distance necessary to stop the train. If appellants' contention is that if the crew had seen the deceased and warned him of the approach, he would have had time to extricate himself, then the contributing cause of the injury was the failure to warn, and not the failure to see. Failure to warn was submitted to the jury. On the other hand, if appellants contend that by keeping a proper lookout, the crew could have stopped the train, the evidence establishes otherwise. Failure to maintain a proper lookout was not a jury question.

Cases cited and references quoted by appellants announce correct principles of law. However, in all instances the time and space factors were such that had the train crew been maintaining any lookout, appropriate action could have been taken in sufficient time to prevent the collision. Not so here.

In support of the next assignment of error, namely, that the court erred in failing to submit to the jury the doctrine of last clear chance, appellants rely in part on the case of *Graham* v. *Johnson,* 109 Utah 346, 166 P. 2d ■

230, 235. The facts are in no way similar, and the reasoning does not sustain appellants' contention. Said the court in that case:

"In Chapter 17, §§ 479 and 480 of Vol. II, Restatement of Torts, the last clear chance doctrine is stated in regard to two situations. Section 479 dealt with a situation where a plaintiff has been negligent in getting himself in a situation from which he cannot extricate himself or in getting himself in a condition where he cannot by alertness avoid the danger in which defendant subsequently puts him, example being when a man goes to sleep on a railroad track or gets his foot caught in a frog. In either case the point has been passed where he could by alertness avoid the danger of the oncoming train. Section 480 deals with the situation where the plaintiff was inattentive but had the ability, had he been alert, to avoid the oncoming danger to which the defendant was subjecting him. But in both cases the liability of the defendant arose because he failed to take the opportunity which he alone had timely to avoid doing the plaintiff harm even though the plaintiff was negligent in getting himself in a position where he was helpless or because he was so inattentive that he was not alert to the approaching danger over which defendant had control. And in both cases to hold the defendant liable it must plainly appear to the jury that defendant knew or reasonably should have known of plaintiff's helpless peril or of his inattention and after such realization or after he reasonably, had he been conducting himself with the vigilance required of him, should have known it, 'is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff'. In the clear chance doctrine the plaintiff's negligence has become in a sense fixed and realizable, and on to this state of things defendant approaches on to the negligent plaintiff with and in control of the danger."

Again, in the petition for rehearing of this same case, found in 109 Utah 365, 172 P. 2d 665, 666, this court said:

"* * * When one party thrusts upon another the onus of avoiding an accident which was due entirely to the fact that the first party is in the fairly rapid process of placing himself in the path of a car driven by the second party, the court, before it permits the jury to determine whether the second party could have avoided the accident, must be reasonably sure that there was time enough for the jury to so find. Where the situation is, to reasonable minds, so doubtful as to whether the second party had time to avoid it, the matter should not be given to the jury; otherwise, we are, as said in the case of *Thomas* v. *Sadleir* [108 Utah 522], 162 P. 2d 112, 115, in grave danger of per-

mitting the one really at 'fault to shift the blame for the accident on the other by accentuation of the other's duty to avoid the effect of the first one's negligence.' "

In this case the deceased, if negligent, would be negligently inattentive, and the provision of Section 480, Chapter 17, Vol. II, Restatement of Torts, would be applicable:

"A plaintiff who, by the exercise of reasonable vigilance could have observed the danger created by the defendant's negligence in time to have avoided harm therefrom, may recover if, but only if, the defendant (a) knew of the plaintiff's situation, and (b) realized or had reason to realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid the harm, and (c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff.

\* \* \* \* \*

"B. When Defendant Can Assume Plaintiff Will Avoid Danger. It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. \* \* \*"

The illustration given in Par. 480, Restatement of Torts is on all fours with this case. Here we have the deceased approaching a track on a level road where at least for the greater part of the last 160 feet travelled by him he had an unobstructed view of the track. We need only take the evidence most favorable to the plaintiff for this discussion, and from this it is established that the truck continued on its course without stopping until it was on the track. The

engineer or other members of the train crew could assume the deceased would stop until he was so close to the track that a reasonable person would know otherwise. Undoubtedly when deceased cleared the one tree some 20 feet from the crossing, it would be apparent that he did not intend to stop. Disregarding the testimony of two members of the crew that when they did see the truck clear this tree they gave the emergency signal, appellants' evidence only permits one or two seconds for the train crew to have taken the necessary steps to have prevented the accident. This is not giving the defendant the last clear chance. The opportunity to avoid the accident must not be a possibility; it must be a clear opportunity. Not even by speculation could the jury reach a verdict on the theory that the train crew had time to appreciate that deceased was negligent and that by reasonable means they could have avoided the ensuing collision. When, as in this jurisdiction, a train has the preferred right of way, its operator is entitled to assume the driver of a car will yield to this preferment, and if the doctrine of last clear chance is to be invoked, it must clearly appear that time permitted the train crew to appreciate deceased's predicament, and to give warnings sufficiently early enough for the deceased to extricate himself, or the time element was sufficient to permit the crew to bring the train to a stop. No such showing was made here.

Again, attention is directed to the dispute in the evidence about the ringing of the bell and the blowing of the whistle. Appellants' witnesses testified no such warnings were given, while respondent's witnesses testified they were. If they were not given, then, under the instructions given by the court, the jury could have found in favor of the appellants on this issue without invoking the doctrine of last clear chance. This the jury failed to do, so the only other act the train crew could have taken to have avoided the collision was to have brought the train to a stop. The evidence establishes this as an impossibility. The court did not err in failing to submit this question to the jury.

Appellants by appropriate assignment raise the question as to whether or not under the statutory right of recovery for death the defense of contributory negligence of the deceased can be rightly submitted to the jury. Admittedly, this has been the practice in the courts of this state for many years, and there is no compelling reason for this court to overturn a precedent so well established and so firmly entrenched. If a departure from well-recognized principles of law is to be accomplished it should be by legislative action and not by judicial determination.

In the case of *Helfrich* v. *Ogden City Ry. Co.*, 7 Utah 186, 188, 26 P. 295, 296, the principal issue on appeal was the defense of contributory negligence of the deceased. The court held the personal representative could not recover because of the negligence of the deceased in putting his head out of the cab. The following quote establishes the law as announced by this court:

"* * * We think it was negligence in the company in maintaining and operating its road so near the line of telegraph poles; but this case turns upon the question as to whether the carelessness of the deceased caused his death. If he was negligent, and did not use due care, reasonable in the situation, and his want of such care contributed to his injury, the plaintiff cannot recover. This doctrine is so well known and understood that no authority need be cited in its support; but we cite *Quibell* v. *Union Pac. Railway Co.*, [post, 7 Utah 122], 25 P. 734 (decided at this term of this court). * * * In this case the carelessness of the decedent clearly was the proximate cause of his death, and the jury ought to have found for the defendant. * * *"

Appellants rely on the cases of *Mason* v. *Union Pac. R. R. Co.*, 7 Utah 77, 24 P. 796 and *Halling* v. *Industrial Commission*, 71 Utah 112, 263 P. 78, which, in substance, hold that a claim for death is a separate and independent cause of action and is not a continuation of the right of action of the injured party for personal injuries. The death creates a new cause of action for the loss suffered by the heirs by reason of death, and only comes into existence upon the happening of death.

If we follow the reasoning of these two last cited cases, the conclusion is inevitable that they do not overrule the decision in the *Helfrich* case. For the purpose of clarifying the statement, assume that the deceased had only been injured in this collision. The right of action would run in his favor, and the defense of contributory negligence would have been properly submitted. The right of action running to the appellants in this case is founded on the same unlawful acts of the defendant, but the loss and damages suffered by them arise out of the death of the deceased. The legislature has thus said the right of action vests in the heirs-at-law if death ensues but it does not say the rights of the third parties are modified, altered, or changed. On the contrary, it bases recovery on the wrongful death by another and wrongful is used in the sense of wrongful as against the deceased, and does not include those situations where the deceased either solely or proximately contributes negligently to his own death. This court is of the opinion the legislature did not intend to change the rules of substantive law and deny the litigants the right to defend on the ground of contributory negligence. For the purposes of this suit, all that Section 104-3-11, U. C. A. 1943, grants to the heirs is a right to proceed against the wrongdoers subject to the defenses available against the deceased, had he lived and prosecuted the suit. The court did not err in submitting this issue to the jury.

The last assignment presented by appellants is in two parts and in substance assigns error on the part of the court in the giving of instructions on defendant's duty to maintain a good and sufficient crossing. In connection with the first part of this assignment, appellants claim the court erred when it refused to instruct the jury that the defendant had the duty to maintain the crossing for a width of 16 feet. There are several reasons why this portion of the assignment must be overruled. Firstly, the charge of failure to maintain the crossing for this width was not raised by the pleadings, and therefore was not in issue. Appellants make mention of Section 36-3-2, U. C. A.

1943, but the particulars alleged in their complaint are these:

"Paragraph 10. * * * That said defendant negligently, carelessly, unlawfully, and in violation of said Statutes aforesaid, caused said crossing to be out of repair and in an unsafe condition for motor vehicles to pass over the same and particularly the said Ford pick-up truck driven by the said Dean Van Wagoner, as aforesaid, in this, that said defendant had caused said tracks to be constructed and maintained across said public highway without adequate or sufficient approaches to the said railroad tracks and without raising the said public road to the elevation of the said rails on either side and in between the set of tracks at said point and without causing the space between the rails to be filled up and raised to a proper and safe elevation with planks, cement, gravel, or other suitable material. That the condition of said crossing retarded the movement of said Ford pick-up truck in crossing over said defendant's tracks, as herein set forth."

Secondly, Section 36-3-2, U. C. A. 1943, as referred to in the complaint and insofar as applicable in this matter, states the following requirements:

"* * * and bridges over any ditch, waterway or opening across any roadway section of any highway, except river bridges, shall not be narrower than *the full width of the roadway* section, less a space of five feet from the curb line on either side on highways four rods or more in width, and less a space of two and a half feet from the curb line on either side on two-rod lanes. * * * On county roads the board of county commissioners, and on roads upon which work is done at the expense of the state the state road commission, may grant permission for temporary bridges of narrower widths than those herein indicated for highways of four rods and more in width, or may order construction in case of necessity narrower bridges; but in no case shall any permission or order be given for a bridge less than sixteen feet in width to be used as a public roadway. * * * Railways crossing public highways shall have their crossings conform to the widths herein required for bridges and flumes, and to the regulations herein fixed as to changing grades for ditches, canals or waterways." (Italics added.)

Roadway is defined in Section 36-3-1, U. C. A. 1943, Sub. 6, as follows:

"(6) 'Roadway' is that portion of a street or highway between the regularly established curb lines or that part improved and intended to be used for vehicular travel."

The wording of these sections establish that the 16-foot width referred to is applicable when the county commissioners or the State Road Commission give permission to construct temporary bridges. The court disregarded this provision and elected to instruct that the crossing must be maintained to a width equal to the main travelled portion of the highway. This is substantially in accordance with the first part of Section 36-3-2 and with Section 77-0-11, U. C. A. 1943. This latter section makes specific reference to liability for defects in crossings, and it is as follows:

"Every railroad company shall be liable for damages caused by its neglect to make and maintain good and sufficient crossings at points where any line of travel crosses its road."

This is the real duty imposed on the railroad, regardless of the width of the crossing, and this is the duty of the court referred to in its instructions.

Lastly, under the facts and circumstances of this case, the width of the crossing had no causal connection with the collision. The pleadings and evidence clearly establish that if the crossing was negligently maintained, it was because of holes in the travelled portion of the highway, and the high exposure of rails. There was adequate room for deceased to pass over the main travelled portion of the road, there was no interfering traffic, and there was no evidence that he drove off the main travelled portion of the road. If the jury had accepted the testimony of appellants' witness, the holes and the high exposure would have been a hazard regardless of the width of the crossing. If the forward progress of the truck was impeded, it was because of the holes in the travelled portion of the roadway, and not because the deceased was slowed down or limited by the width of the crossing.

For the jury to have found that the width of the crossing was a proximate cause of the collision, it would have been required to base its finding, not upon the evidence, but upon a presumption that the deceased abandoned the main travelled portion of the crossing to travel over an unimproved

section without approach or without filling of any kind between the rails. The presumption of due care is in favor of the deceased, and not against him.

The second subdivision of the last assignment of error also raised the question of error on the part of the trial court in failing to give a requested instruction. ■ Section #539, Revised Ordinances of American Fork, Utah, 1929, in force and effect at the time of this collision, provided, in part, as follows:

"Section 539. Arches and Bridges. Tracks on Grade. * * * All railroad companies shall plant or pave with suitable paving material between the rails and for two feet on either side of the outrail on all streets that cross the said tracks said planking or paving to be for the full width of said cross streets and sidewalks, unless otherwise directed by the city council; such planking or paving shall be kept at all times in good repair by such railroad company."

Basing an act of negligence on the failure to comply with this ordinance, the appellants submitted the following requested instruction:

"You are instructed that it was the duty of the defendant railroad company to plank or pave with suitable paving material between the rails, and for two feet on either side of the outrail on Fourth West Street in American Fork City where it crosses defendant's railroad tracks. Said planking or paving to be installed for the full width of said cross-street, unless otherwise directed by the City Council of said American Fork City; such planking or paving shall be kept at all times in good repair by said defendant railroad company. If you find that defendant railroad failed to maintain such a crossing as hereinabove set forth, at the time of the accident in question, you are authorized to infer negligence on the part of the defendant as one of the facts established in the case."

The court extracted part of the request, but failed to instruct on the duty to plank or pave with suitable paving material. Failure to give this requested instruction is assigned as error.

The instruction given by the court was this:

"You are further instructed that by the law of this state every railroad company owning or operating a railroad is required to make and

maintain good and sufficient crossings, equal in width to the main travelled portion of the highway, at points where any city or town street or public highway crosses its tracks; and it is liable for all injuries resulting from neglect of this duty if the party injured is guilty of no negligence contributing to such injury. However, the railroad company is only obligated to maintain the approaches to the crossing for a distance of two feet on the outside of its rail and is not liable for defects in the highway or approach to said crossing if said defects are more than two feet from the outside of either rail. In this connection you are instructed that a 'good and sufficient crossing' is a crossing that is sufficient and ordinarily safe for the travelling public to pass to and fro over, keeping in mind its location, whether in a sparsely settled or populous locality, and the character and volume of traffic that ordinarily may be expected to pass over it."

This instruction was approved by this court in the case of *Denkers* v. *Southern Pacific R. R. Co.*, 52 Utah 18, 171 P. 999, which was a crossing collision on 17th Street in Ogden, Utah. The two cases are dissimilar in that the *Denkers* case there is no reference made to City Ordinances and their applicability. In this case there is. However, there is a state statute which makes the railroad company liable for all damages caused by its neglect to make and maintain a good and sufficient crossing. Section 77-0-11 quoted herein. This makes the railroad liable for an unsafe crossing regardless of the materials used for its construction or maintenance. The duty under this section of the statute is the same as that required by the ordinance, yet the statute is silent as to the manner of construction or the materials used. Under both the duty to the travelling public is for the railroad company to maintain a good and sufficient crossing. The court in its instruction used the wording set out in the state statute and if we were to assume it was error not to instruct in the words of the ordinance it is not made to appear that appellants were prejudiced.

For the purpose of this decision, it may be assumed that both the statute and the ordinance were enacted for the purpose of assuring travellers a safe and speedy passage across railroad tracks. The statute is silent and the ordinance does not limit the material to plank or cement, but permits

the use of other similar materials. This permits some discretion on the part of the railroad company, and the appellants in their complaint recognize this as they allege that the space between the rails was not filled to the proper level with planks, cement, *gravel, or other suitable material.*

We need not determine whether or not the materials used by the railroad at this particular crossing were suitable paving materials, as if the railroad company violated any duty it owed deceased, this violation consisted of not maintaining a good and sufficient crossing. If it had filled between the rails with cement or planks, and they were not maintained in a safe condition, it would have failed in its duty to the travelling public and if it had filled with other materials which rendered the crossing safe and good, the rights of the traveller would not have been invaded. In this case, if deceased was stalled by holes in the road and the exposure of high rails, his heirs have just complaint, regardless of the type of substance used to form the road surface between the rails. If the crossing were as smooth as glass, the type of substance used would be unimportant, and the appellants would have no basis of complaint. That this is the duty which appellants claim was violated is apparent from the allegations of the complaint. The charging part is as follows:

"* * * that said defendant had caused said tracks to be constructed and maintained across said public highway without adequate or sufficient approaches to the said railroad tracks and without raising the said public road to the elevation of the said rails on either side and in between the set of tracks at said point and without causing the space between the rails to be filled up and raised to a proper and safe elevation with planks, cement, gravel, or other suitable material. That the condition of said crossing retarded the movement of said Ford pick-up truck in crossing over said defendants tracks, as herein set forth."

The instruction on the maintenance of the crossing was given by the trial court in the words of the statute and in conformity with appellants' theory. It was adequate to permit the jury to find for the appellants if the jurors were to believe from the evidence that the deceased was stalled because of an improperly maintained crossing.

This case involved a lengthy trial. Many witnesses were called and almost every issue of fact was in dispute. The trial court submitted the matter to the jury with appropriate instructions and no prejudicial error appears in the record. Such being the case, we are compelled to affirm the judgment. It is so ordered. Costs to respondent.

McDONOUGH, C. J., and PRATT and WADE, JJ., concur.

WOLFE, Justice.

I concur in the results of the prevailing opinion, and in general with the reasoning advanced in support thereof.

I think the second assignment of error, the refusal of the trial court to instruct on the train crew's failure to keep a proper lookout, ought to be divided into two parts according to the effect of a failure to keep a proper lookout. I think the evidence together with all legitimate inferences therefrom is all one way, that the train, even with the best of lookouts, could not be stopped after it became apparent to the crew that the driver of the truck was not going to stop. There simply was not time then for the train to be stopped in order to avoid the collision. I adopt the reasoning of the main opinion in that regard. The second effect of failure to keep a proper lookout might result in a failure to sound a timely warning of the near approach of the train after it should have been appreciated by a properly vigilant crew that the truck was going to drive onto the track. The appellants cite *Graham* v. *Johnson,* 109 Utah 346, 166 P. 2d 230, wherein we held, among other things that the clear chance to avoid an accident might not necessarily involve a stop, but a duty to sound a timely warning in cases where the plaintiff was not trapped but merely inattentive.

This duty may be in the case of a train quite different from a statutory duty or traffic rule to sound a bell or blow a whistle a certain distance from a crossing as a safety measure. The alleged duty I am here speaking of is the timely sounding of a warning when the predicament of plaintiff should be apparent to one performing his duty of keeping

a watch. As the main opinion states, the *Johnson* case was quite different from the present case. In any case, regardless of what sort of watch was kept when it should have been apparent that the truck was going to drive onto the track, there was no time to avoid a collision. So as to the collision the failure to keep a proper lookout, if any, was not a contributing cause. The main opinion well states this proposition. And so to the alleged failure to give warning after the emergency was appreciated, there is no showing that the warning would have done any good, that is, that assuming, proper watchfulness a warning could be given in time to give the driver of the truck sufficient opportunity to escape from his car or get out of his stall and proceed to safety. We held in *Graham* v. *Johnson*, supra, that the clear chance doctrine was applicable in situations where there was a clear opportunity to avoid the accident, and that means, in this case, a clear opportunity to avoid the collision, and if not the collision, then personal injuries. The law does not hold one guilty of a negligence in avoiding damage to another who is himself guilty of negligence in getting himself into a trap or dangerous position, unless it is first clear that there was ample opportunity on the part of the defendant to bring about an avoidance of the consequences of plaintiff's negligence in whole or in part. And under this doctrine defendant cannot be held to niceties in making choices of action since the situation demands quick action. As the main opinion well states,

"The opportunity to avoid the accident must be not a possibility; it must be a clear opportunity."

Under the evidence in this case, including that of Miss Bowers, I think we must say that in law, even though there was testimony from which it might be inferred that the lookout was not up to par, there is no showing that such delinquency contributed to the decedent's death either as primary negligence or as a factor in the clear chance doctrine. It is for these reasons that I concur with the conclusions of the prevailing opinion in regard to the second

assignment of error to the effect that the court failed to instruct as to keeping a proper lookout.

I concur in the holding and in the reasons stated in the prevailing opinion that in the statutory action for death the defendant may interpose the contributory negligence of plaintiff as a defense. While the statutory cause of action given to the heirs or personal representative of a decedent is different from that of an injured plaintiff in that the damages given for loss by death are different, the cause for action is the same, to wit, the negligence of the defendant. Contributory negligence is a defense not because it cancels out the defendant's negligence, but because it concurs in producing the damage. The common law refused to aid a person in recovering damages when he himself failed to exercise the standard of care imposed by the law. See Bohlen, Studies in the Law of Torts, Ch. IX, "Contributory Negligence," pp. 500-535. This policy, of course, is subject to change by legislation which proportions the delict or assesses the respective faults of each which contributed to the damage. The Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., is an instance of this.

I concur in the holding that there was no error in the court's instructions regarding the duty of the defendant to maintain a good and sufficient crossing. Moreover, unless it is shown that the crossing was in such condition as to so substantially impede the progress of the driver of the car as to trap him so he could not proceed, and that this delayed him for such time as prevented him from avoiding the collision, the condition of the crossing could not be said to have contributed to the accident. A driver who drives in front of an oncoming engine or train with insufficient time to cross is hardly in position to say:

"If you had made it smoother, I might or could have gotten clear by a hair."

For the reasons herein given I concur.