## No. 1128.

MELINDA VAN AMBURG vs. VICKSBURG, SHREVEPORT AND PACIFIC RAILROAD COMPANY.

Recovery of damages for the death of a freeman, caused by an accident occurring before the passage of the Act of July 10, 1884, cannot be had in the face of the uniform jurisprudence forbidding it.

A railway company is responsible in damages for an accident caused by an imperfect and unsafe bridge to an engineer of the company, although the road was in course of construction and not yet open for traffic or travel and although the bridges while the road

is constructing are not required to be as perfect as when finished for traffic and travel. They must be sufficient not to needlessly endanger the lives or limbs of the employees while the road is in its unfinished state.

The defence that a railway company is not responsible for accidents occurring in the absence of its governing officers cannot be listened to. Such doctrine would be tantamount to relieving the company of all responsibility. The company is present in the person of the conductor of the train, or such employee as is operating it.

The doctrine of fellow-service releasing a railway company from liability for injuries, because the servant injured is fellow with the servant through whose fault the injury was suffered, is modified, and it is now established that a conductor of a train represents the company for the time and is the master of the engineer who is obliged to obey his orders.

It is error to charge the jury that although damages for the death of a person caused by a railroad before July 10, 1884 are not recoverable, yet they are recoverable for the loss of support by the deceased, because that is the direct consequence of the death.

APPEAL from the Fifth District Court, Parish of Ouachita. *Richardson*, J.

*Boatner & Boatner* for Plaintiff and Appellee.

*A. B. Pittman* and *Ludeling & Stillman* for Defendant and Appellant.

The opinion of the Court was delivered by

MANNING, J. The plaintiff sues for the recovery of damages sustained by the death of her son caused by the breaking of a bridge on the defendant railway at Alligator bayou in Bossier parish. The damages are laid at five thousand dollars for agony and suffering bodily and mental endured by the victim of the disaster, and a like sum for the loss of his support and the deprivation of his society, care, and affection.

The defence is a general denial and a plea of contributory negligence. The verdict was for one half the sum claimed, viz five thousand dollars.

The second item of damage cannot be considered. Legislation and jurisprudence have combined to perpetuate the extraordinary doctrine that the life of a free man cannot be made the subject of valuation, and under the domination of that dogmatic utterance, made earlier than the Roman Digest, reproduced therein, and echoed by the courts of all countries from then till now, the singular spectacle has been witnessed of courts sanctioning damages for short-lived pains and refusing them for a long-life sorrow and the pecuniary losses consequent upon the death of one from whom was derived support, comfort and even the necessary stays of life. Legislation has at last come to the relief of future sufferers. The Act of 1884 applies the remedy that the public conscience has long demanded, but it has missed application to this case only by a few days. That Act was approved July 10th and took

effect in Bossier on the 30th. The accident and death occurred on the 25th of that month.

It was ingeniously argued to us that this statute merely provided a remedy for a previously-existing obligation—that in morals and conscience he who caused the death of another should make reparation to the survivors as in law he who caused damage by a fault was legally obliged to repair it—and therefore that the remedy provided by the statute could be and ought to be applied to injuries inflicted before its passage. This would open the door to a multitude of suitors and therefore courts would be cautious in making such interpretation, but in truth the argument is not sound, for it is based on the assumption that this is a remedial statute and on the principle that such statutes are construed liberally, but our late statute is not remedial in the sense of supplying a remedy. It creates an obligation by expressly declaring the existence of a liability where there was none before and opens the way to a recovery for its violation.

The son who was killed, James Van Amburg, was a locomotive-engineer on the defendant railway and was running a construction train over the bridge across Alligator bayou when the bridge broke, the engine was hurled a depth of ninety feet into the bayou, and the engineer was killed. The road was not open for traffic or travel. The train was composed of two flat-cars in front of the engine and one box-car in rear. The conductor and some of the labourers were in the front car. The bridge was not in the condition that was intended to be permanent, that is it was not finished in the manner it was intended to be for permanent use, but it was completed as far as it was intended to be for construction purposes. The foundation and skeleton of the bridge was complete. One cap was on each of the piles and the stringers were laid on those caps. When construction was completed another cap would have been placed on and thicker stringers and these would bring the bridge to a level with the road-bed. The stringers were made of round logs hewed to a flat surface, were of gum, ash, pine and some oak and cypress, were twelve inches thick and fifteen feet long, and had been cut from the forest about six months before the accident. They were green when laid down.

In its then condition the bridge was lower than the road-bed. There was consequently an incline at each end, the road-bed sloping down to the bridge which therefore formed a sort of concavity.

The party was late getting out to work on that day and the train was moving fast, too fast say the conductor and another for safety. Van

Amburg was prone to run fast. That was characteristic of him. He was singularly exemplary in his habits—did not drink spirituous liquors, was active, intelligent, knew his business well and attended to it punctually and methodically.

This driving the engine is the contributory negligence pleaded. The conductor testifies that six miles an hour was fast enough to run over this bridge—ten miles the maximum of speed, and the chief engineer of the company says "the condition prevailing there at that time could not have permitted a higher rate of speed than eight miles an hour." The concurrent testimony is that the train was running at not less than fifteen miles an hour.

The bridge is thus shewn to have been unsafe and its unsafety was known to the chief engineer who had authority to have it made safe and to the conductor who had control of that train and could have made the locomotive-engineer slack to a snail's pace if he had been then as alive to the danger as he was on the trial. His neglect to peremptorily order the crossing this bridge at this time and at all times at not greater speed than ten miles, which he says was the maximum permissible, is little short of criminal. On this particular occasion it was more than ever his duty to do it. He knew Van Amburg was prone to drive fast, and that he was energetically devoted to the interests of his employers. On that day the gang of labourers was late and though it was no fault of Van Amburg's, his concern for the work would inevitably induce him to make up for lost time and not time he had lost himself. The conductor only a few minutes before had flagged him down, according to his expression, and he had crossed Red Chute bridge safely. He might have saved the engineer's life if he had appreciated the situation as vividly as he did while on the witness-stand.

The insecurity of the bridge and the failure of the conductor to command and compel the engineer to always cross it at a safe speed, were the combined causes of the accident. The company is responsible for both – for the imperfect bridge, for although a bridge for construction-purposes is not required to be as solid and complete as for traffic when heavy trains must pass over it, it is necessary that it should be solid and complete enough to make it safe. No company has any right to trifle with the lives of its employees, nor to put them in greater peril than is incident to the nature of their employment. It cannot for the sake of economy or other cause fail to make even its temporary structures sufficiently safe for the contingencies of its special work. No inflexible rule can be laid down on such matters. A

scaffolding around a building two storeys high upon which one workman is to stand need not be as solid and compactly put together as one around a tower of several hundred feet in height upon which a half-dozen workmen must stand. Each guild or branch of industry knows its own special needs. A railroad company knows, or it is its duty to know at its peril, what is a safe bridge, and there is no sort of doubt they did know this bridge was not safe.

The company is responsible for the other cause, for the conductor was the company on that day and for that occasion. He had exclusive command of that train—was to the engineer his master for the time and did not so much represent the company as personate it. He was the company in bodily form with authority to command and power to enforce. The pretention that no responsibility can attach to the company except when it is present through its chief officers would practically relieve it from all responsibility. With its president in New York and its directors equally remote no possibility of fastening upon it any liability whatever would exist. No other doctrine than that it is present in the person of those of its employees who for the time operate it would give the smallest modicum of protection to the public.

The defence that no recovery can be had because, even admitting that the fault lies with the conductor, his act was that of a fellow-servant, is no longer tenable to the extent formerly admitted. The case of Chicago, Milwaukee, & St. Paul R. Co. v. Ross, 112 U. S. Rep. 377 has made an inroad on jurisprudence in the right direction, and we have applied the new principle there established at the present term. The reasons therefor have been or will be elaborated in our opinion in 'Towns v. the same defendant and it would be superfluous to repeat them.

Among the numerous instructions excepted to by the defendant is the following ;—that while the plaintiff could not recover damages for the death of her son, the jury may assess them in her favour for loss of his society and services and for support to such extent as it appears he would have given her had he not been killed.

That charge is error and misled the jury. The loss of his society and of his aid in her support is the direct consequence of his death, and damages given therefor are damages for his death. Under the law as it existed when he was killed such damages are not recoverable. The verdict lumps the damages and we cannot know what portion was given for the recoverable cause and what for the unrecoverable, and we must therefore assess them ourselves.

The death was immediate if not instantaneous. The unfortunate man was precipitated with the engine ninety feet. His forehead was cut and if he survived the blow upon his head, death by drowning followed quickly. No arithmetical calculation can compute the intensity of that agony that overwhelms the victim of such an accident when he confronts death, but a sum has to be adopted and its apportionment to the duration and intensity of the suffering is not determinable by fixed rules. What was endured is unknown and unknowable, but it is safe to conclude that the jury gave the larger part of their verdict for the loss of support and the laceration of the mother's heart by the horrible death of her young and only son. Those elements of damage must be eliminated and we shall reduce the judgment.

It is therefore ordered and decreed that the judgment of the lower court is amended by reducing the sum therein mentioned to one thousand dollars, and as thus amended it is affirmed, the plaintiff and appellee paying costs of appeal.