FRANCIS ET AL. *v.* SOUTHERN PACIFIC CO.

No. 400.    Argued February 5, 1948.—Decided March 15, 1948.

*Parnell Black* argued the cause for petitioners. With him on the brief were *Calvin W. Rawlings* and *Harold E. Wallace.*

*Paul H. Ray* argued the cause for respondent. With him on the brief was *S. J. Quinney.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioners are the minor children of Jack R. Francis who was killed while riding as an interstate passenger on one of respondent's trains. They brought this suit, acting through their general guardians, to recover damages on account of his death. Jurisdiction in the federal court was founded on diversity of citizenship. The trial judge submitted to the jury only the question of respondent's wanton negligence. The error alleged is his refusal to submit to the jury the issue of ordinary negligence. The jury returned a verdict for respondent. The Circuit Court of Appeals affirmed. 162 F. 2d 813.

The Circuit Court of Appeals held that Utah law creates a right of action in the heirs for the wrongful death of the decedent and that the action is distinct from any which decedent might have maintained had he survived. But the court held that the action is maintainable only where the decedent could have recovered damages for his injury if death had not ensued. In this case the decedent, an employee of respondent, was riding on a free pass not in connection with any duties he had as an employee but as a passenger only. The Circuit Court of Appeals therefore held as a matter of federal law that respondent would not have been liable to decedent for damages caused by ordinary negligence, relying on *Northern Pacific R. Co.* v. *Adams,* 192 U. S. 440. It concluded that respondent had the same defense against the heirs. We granted the petition for a writ of certiorari to reexamine the relationship between local law and federal law respecting the liability of interstate carriers under free passes.

In *Van Wagoner* v. *Union Pac. R. Co.,* — Utah —, 186 P. 2d 293, decided after the petition for certiorari in the present case was filed, the heirs sued to recover damages for the death of the decedent in a grade-crossing accident. The court held that a defense of contributory negligence which would have barred recovery by the decedent likewise bars the heirs. In view of this ruling by the Utah Supreme Court we cannot say that the Circuit Court of Appeals committed plain error in holding that respondent had the same defenses against petitioners as it would have had against the decedent.[1] Yet it requires such showing of error for us to overrule the lower courts in

---

[1] The Utah Supreme Court in its original opinion in the *Van Wagoner* case stated that the right granted the heirs is a "right to proceed against the wrongdoer subject to the defenses available against the deceased, had he lived and prosecuted the suit." On petition for rehearing that statement was eliminated and the follow-

their applications of *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. See *Palmer* v. *Hoffman,* 318 U. S. 109, 118; *MacGregor* v. *State Mutual Co.,* 315 U. S. 280; *Steele* v. *General Mills,* 329 U. S. 433, 439. Cf. *Wichita Co.* v. *City Bank,* 306 U. S. 103.

The free pass in the present case stated that "the user assumes all risk of injury to person or property and of loss of property whether by negligence or otherwise, and absolves the issuing company . . . from any liability therefor." In *Northern Pacific R. Co.* v. *Adams, supra,* a similar provision in a free pass was sustained as a defense to an action brought under an Idaho statute by the heirs of a passenger.[2] That was in 1904. The *Adams*

---

ing one substituted: "Under the facts of this case the right to proceed against the wrongdoer is subject to the defense of contributory negligence." 189 P. 2d 701.

That ruling is no deviation from the Utah law as construed by the lower federal courts. It supports the view of Utah law taken by the Circuit Court of Appeals and is in line with the weight of authority in the state courts. See *Mellon* v. *Goodyear,* 277 U. S. 335, 344–345. Hence we do not deem it appropriate to remand the case for consideration of the intervening decision in the *Van Wagoner* case. Cf. *Huddleston* v. *Dwyer,* 322 U. S. 232.

[2] The Court said, pp. 453–454:

"The railway company was not as to Adams a carrier for hire. It waived its right as a common carrier to exact compensation. It offered him the privilege of riding in its coaches without charge if he would assume the risks of negligence. He was not in the power of the company and obliged to accept its terms. They stood on an equal footing. If he had desired to hold it to its common law obligations to him as a passenger, he could have paid his fare and compelled the company to receive and carry him. He freely and voluntarily chose to accept the privilege offered, and having accepted that privilege cannot repudiate the conditions. It was not a benevolent association, but doing a railroad business for profit; and free passengers are not so many as to induce negligence on its part. So far as the element of contract controls, it was a contract which neither party was bound to enter into, and yet one which each was at liberty to make, and no public policy was violated thereby."

decision was soon followed by *Boering* v. *Chesapeake Beach R. Co.,* 193 U. S. 442. Then in 1906 came the Hepburn Act which under pain of a criminal penalty prohibited a common carrier subject to the Act from issuing a "free pass" except, *inter alia,* to "its employees and their families." 34 Stat. 584, 49 U. S. C. § 1 (7). Thereafter in 1914 the Court held that the rule of the *Adams* case was applicable under the federal statute and that the "free pass" was nonetheless a gratuity though issued to an employee of the carrier. *Charleston & W. C. R. Co.* v. *Thompson,* 234 U. S. 576. *Kansas City So. R. Co.* v. *Van Zant,* 260 U. S. 459, followed in 1923 and held that the liability of an interstate carrier to one riding on a "free pass" was determined not by state law but by the Hepburn Act. The Court said, p. 468, "The provision for passes, with its sanction in penalties, is a regulation of interstate commerce to the completion of which the determination of the effect of the passes is necessary. We think, therefore, free passes in their entirety are taken charge of, not only their permission and use, but the limitations and conditions upon their use. Or to put it another way, and to specialize, the relation of their users to the railroad which issued them, the fact and measure of responsibility the railroad incurs by their issue, and the extent of the right the person to whom issued acquires, are taken charge of."

For years this has been the accepted and well-settled construction of the Hepburn Act. During that long period it stood unchallenged in this Court and, so far as we can ascertain, in Congress too. Then came the Transportation Act of 1940, 54 Stat. 898, 900, with its comprehensive revision of the statutes of which the Hepburn Act was part. Amendments were made to the free-pass provision of the Act to permit free transportation of additional classes of persons.[3] No other amendments to the

---

[3] See H. R. Rep. 2016, 76th Cong., 3d Sess., p. 59.

free-pass provision were made. It was reenacted without further change or qualification. In view of this history we do not reach the question of what construction we would give the Hepburn Act were we writing on a clean slate. The extent to which we should rely upon such history is always a difficult question which has frequently troubled the Court in many fields of law and with varied results. See *Girouard* v. *United States,* 328 U. S. 61, 69, 70; *Helvering* v. *Hallock,* 309 U. S. 106, 119, 123. But in the setting of this case, we find the long and well-settled construction of the Act plus reenactment of the free-pass provision without change of the established interpretation most persuasive indications that the rule of the *Adams, Thompson,* and *Van Zant* cases has become part of the warp and woof of the legislation. See *Missouri* v. *Ross,* 299 U. S. 72, 75; *United States* v. *Elgin, J. & E. R. Co.,* 298 U. S. 492, 500; *United States* v. *Ryan,* 284 U. S. 167, 175; *Hecht* v. *Malley,* 265 U. S. 144, 153; *Electric Battery Co.* v. *Shimadzu,* 307 U. S. 5, 14. Any state law which conflicts with this federal rule governing interstate carriers must therefore give way by virtue of the Supremacy Clause. For it was held in the *Van Zant* case that the free-pass provision of the Hepburn Act was a regulation of interstate commerce "to the completion of which the determination of the effect of the passes is necessary." Thus there is no room for the application of *Erie R. Co.* v. *Tompkins, supra,* on this phase of the case. The *Van Zant* case arose not in a lower federal court but in a state court; the holding was not a declaration of a "general commercial law" but a ruling that "the incidents and consequences" of the pass were controlled by the federal act "to the exclusion of state laws and state policies." 260 U. S. at 469.

Petitioners contend that the jury panel from which the jury in this case was selected was drawn contrary to *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217. We do not stop

to inquire into the merits of the claim. The objection was made for the first time in the motion for a new trial. It seems to have been an afterthought, as the *Thiel* case was decided a few weeks after the verdict of the jury in the present case. If not an afterthought, it is an effort to retrieve a position that was forsaken when it was decided to take a gamble on the existing jury panel. In either case the objection comes too late. Cf. *Queenan* v. *Oklahoma,* 190 U. S. 548, 552.

*Affirmed.*

Mr. Justice Black, with whom Mr. Justice Murphy and Mr. Justice Rutledge join, dissenting.

Utah law permits recovery against a railroad when its negligence is responsible for a passenger's death, whether that passenger rides on a free pass containing an attempted waiver of liability for negligence or pays his fare in money. Because I believe Utah law should govern this case I would reverse this judgment. But I think affirmance of the judgment is equally wrong whether the case is to be considered governed wholly by Utah law, by federal law, or in part by both.

No act of Congress has entrenched upon the long-existing power of all the states, including Utah, to provide damages for such wrongful deaths as this complaint alleged. If there is here any barrier to recovery based upon federal law, it is grounded in judge-made "general commercial law" announced by this Court in the year 1904 in *Northern Pac. R. Co.* v. *Adams,* 192 U. S. 440. The rule laid down in that case was that a railroad could by stipulation validly exempt itself from liability under a state statute for negligent injuries inflicted within that state upon passengers carried wholly gratuitously. Creation of the 1904 *Adams* rule by this Court was under authority of a power then exercised, but repudiated in 1938 in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, whereby

federal courts, in passing upon questions of state law upon which there was no controlling state legislative enactment, declared the "general commercial law" of a state on the federal court's notion of wise public policy, independently of state court decisions.

This Court followed the *Adams* "general commercial law" state rule several times between its creation in 1904 and repudiation of this Court's power to create state law in 1938—the last application of the *Adams* rule having been made by this Court in 1923 in *Kansas City So. R. Co.* v. *Van Zant,* 260 U. S. 459. That decision stated that an act of Congress had made the effect of the conditions in an employee's pass a federal question, but decided that "federal" question entirely by reliance on the old *Adams* "general commercial law" state rule. Since the *Erie-Tompkins* decision in 1938, and in fact since 1923, the *Adams* rule has never been applied by this Court until today. Now it is applied not as a federally created state rule of "general commercial law" but as a judicially created post-*Erie-Tompkins* rule of purely federal law. While this Court may look to the 1904 pre-*Erie-Tompkins* state rule of general commercial law "as a convenient source of reference for fashioning" a post-*Erie-Tompkins* federal rule, *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 367, it should not, as the Court does here, automatically accept the old state rule as a federal rule, without any appraisal of its soundness in relation to present day conditions. No such appraisal has been made here. The old *Adams* rule, questionable enough in its 1904 environment, should in my judgment be critically examined and then abandoned as wholly incongruous with the accepted pattern of our modern society as embodied in legislative enactments.

Furthermore, the 1904 *Adams* rule, even in its original narrow scope, marked a departure from the philosophy of this Court's previous decisions. One subsequent line

of the Court's decisions has tended to limit the 1904 rule's scope while another has tended to expand it. Today's opinion expands that rule beyond any point it has before reached. As indicated, I think the *Adams* "general commercial law" state rule is an obstacle to the execution of present congressional policies embodied in statutes. That obstacle I think should be removed by this Court which fashioned the old rule. In any event, I certainly would not expand the old *Adams* rule to cover the facts of this case.

## I.

It should be noted at the outset that tort law has been fashioned largely by judges, too largely according to the ideas of many. But if judges make rules of law, it would seem that they should keep their minds open in order to exercise a continuing and helpful supervision over the manner in which their laws serve the public. Experience might prove that a rule created by judges should never have been created at all, or that their rule, though originally sound, had become wholly unsuited to new physical and social conditions developed by a dynamic society. A revaluation of social and economic interests affected by the old rule might reveal the unwisdom of its expansion or imperatively require its revision or abandonment.

The Court's uncritical reliance today on the 1904 judicially created rule, which to me is both undesirable and uncertain in scope, emphasizes one of the inherent dangers in judge-made laws pointed out by an eminent legal commentator in the field of tort law. Professor Bohlen, in his Studies in the Law of Torts, 610–611 (1926), had this to say about "dangers" of court-made tort standards: "The first is that of the undue rigidity which results from the unfortunate feeling, that any decision of a court creates a rule of law which, as law, is absolutely and eternally valid. . . . To regard a standard of conduct as fixed

and immutable because judicially announced, is to create a standard which, however just or even necessary at the time, may become a scandal and a hissing in the future."[1]

## II.

In 1944, Jack Francis, aged 30, his wife, aged 29, and their three children, aged 3, 6, and 8, lived in Carlin, Nevada. Jack was then and had been for several years a conductor and brakeman for the respondent, Southern Pacific Company. His father, Ray E. Francis, had served the respondent in the same capacity for 35 years. The elder Francis and his wife lived in Ogden, Utah, and the young Francis family visited them Christmas week. In the early morning of December 31, Jack and his wife boarded a Southern Pacific train at Ogden bound for Carlin. They took seats in the rear car. Both had passes granted by the respondent because the husband was its employee. Each pass contained a printed stipulation that the user assumed "all risk of injury to person" and absolved the railroad "from any liability therefor." A short distance out of Ogden, while the train was still

---

[1] Mr. Justice Cardozo said this about the quest for unvarying and eternal certainty in the law: "I was much troubled in spirit, in my first years upon the bench, to find how trackless was the ocean on which I had embarked. I sought for certainty. I was oppressed and disheartened when I found that the quest for it was futile. . . . As the years have gone by, and as I have reflected more and more upon the nature of the judicial process, I have become reconciled to the uncertainty, because I have grown to see it as inevitable. I have grown to see that the process in its highest reaches is not discovery, but creation; and that the doubts and misgivings, the hopes and fears, are part of the travail of mind, the pangs of death and the pangs of birth, in which principles that have served their day expire, and new principles are born." *The Nature of the Judicial Process*, Benjamin N. Cardozo, 166–67 (1921). "Somewhere between worship of the past and exaltation of the present, the path of safety will be found." *Id.* at 160.

in Utah, an engine and train of cars crashed into the rear car. Husband and wife were killed.

This is one of two suits brought against the railroad by the grandparents as guardians of the three children to recover damages on account of their parents' deaths. The actions were brought under a Utah law since Congress has never passed any act which provides remedies against railroads for negligently injuring or killing railroad passengers, even interstate passengers on interstate railroads. Whether passengers or their dependents shall have a right of action under such circumstances has been a question left by Congress for regulation by the state in which the injury or death occurred. See, *e. g., Chicago, R. I. & P. R. Co.* v. *Maucher,* 248 U. S. 359, 363. See also cases collected in 76 A. L. R. 428–435.

For many years the states did not generally authorize suits for wrongful death. Their omission of such remedies was due to traditional "common law" hostility to recoveries for death. This hostility provoked much lay criticism, echoes of which may be found in the cases cited below.[2] About the middle of the last century, because of "dissatisfaction with the archaisms of the law," state legislatures began to abolish the common law rule by specifically authorizing suits for wrongful death and now all states have such statutes. *Van Beeck* v. *Sabine Towing Co.,* 300 U. S. 342, 346, 350–351. So strong is Utah's antipathy to the common law attitude that Art. XVI, § 5, of the Utah Constitution forbids the state legislature to abrogate the right to recover damages for wrongful death. This suit for damages was brought under the

---

[2] *Van Amburg* v. *Vicksburg, S. & P. R. Co.,* 37 La. Ann. 650, 651, 65, 55 Am. Rep. 517, 518; *Rowe* v. *Richards,* 35 S. D. 201, 206–207, 151 N. W. 1001, 1003; *Salsedo* v. *Palmer,* 278 F. 92, 94; *Maney* v. *Chicago, B. & Q. R. Co.,* 49 Ill. App. 105, 112–113. For a discussion of the state wrongful death statutes, see annotations: L. R. A. 1915E, 1075, 1095, 1163; 23 A. L. R. 1262; 27 L. R. A. (N. S.) 176.

Utah statute enacted in accordance with that state constitutional policy. Utah Code Ann. § 104–3–11 (1943). And in a case involving a federal wrongful death statute this Court has said "It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied" by such statutes. *Van Beeck* v. *Sabine Towing Co., supra* at 350–351.

One count of the complaint here alleged ordinary negligence; the other alleged gross negligence. Either type of negligence would justify a recovery under the Utah statute. And since the complaint claimed recovery under the Utah statute, liability, if any, springs from that statute. See *Spokane & I. E. R. Co.* v. *Whitley,* 237 U. S. 487, 494–495. Under Utah law the railroad here could not have defeated liability in this case on the ground that the passes stipulated that the users would assume the risk of injury. The trial judge charged the jury, however, that because of opinions of this Court the pass exemption stipulation was valid and barred recovery "for just ordinary negligence." The Circuit Court of Appeals affirmed on the basis of this Court's *Adams* and *Van Zant* cases. 162 F. 2d 813, 816. The action of the two lower courts was in accordance with their interpretation of this Court's opinions notwithstanding the fact that long ago the Utah Supreme Court, in declaring state law, rejected such a contention in the following language: "It is argued that even if the ticket was a free pass gratuitously possessed with the conditions printed thereon, still the defendant could not escape liability for its negligence. We believe the plaintiff is correct in this contention." *Williams* v. *Oregon Short Line R. Co.,* 18 Utah 210, 221, 54 P. 991, 994 (1898). See also *Houtz* v. *Union Pacific R. Co.,* 33 Utah 175, 179, 93 P. 439, 441; *Hansen* v. *Oregon Short Line R. Co.,* 55 Utah 577, 581–582, 188 P. 852, 854. This

Court has itself recognized and acted on the fact that it is the law of Utah that "when a common carrier accepts a person as a passenger, he is not permitted to deny that he owes to him the duty of diligence, prudence, and skill, which, as carrying on a public employment, he owes to all his passengers; and that he cannot escape liability for a negligent performance of that duty resulting in injury by urging that the pass or commission was issued, or the gratuitous passage permitted, by him, in violation of law." *Southern Pac. Co.* v. *Schuyler,* 227 U. S. 601, 609–610.[3]

In the *Schuyler* case this Court sustained a Utah judgment under the Utah wrongful death statute, which judgment permitted recovery for death of a "gratuitous" passenger killed while riding free, although assuming he was

---

[3] The recent *Van Wagoner* Utah Supreme Court decision cited by the Court is not out of harmony with the above cases but, as amended on rehearing, is expressly limited to a holding that contributory negligence of a decedent may bar recovery under the Utah statute on the part of his heirs. That holding simply means that the death was not "wrongful" under the statute. It does not mean that where there is company negligence Utah would hold that a railroad could barter away the beneficiary's rights.

And as I read the opinion of the Circuit Court of Appeals in the case now before us, it did not hold that under Utah law an action is maintainable only where "the decedent could have maintained an action to recover damages for his injury if death had not ensued." For that statement in its opinion, the Circuit Court of Appeals relied only on the *Adams* case and several other opinions of this Court. It did not purport to be construing Utah law. On this point, therefore, there is no question presented as to whether the Circuit Court of Appeals made a "plain error" in the construction of state law. The state law on that subject has been very clearly stated by the State Supreme Court to the effect that it "is beyond the power of the Legislature to take from the dependents of an employee their claim against the employer, where such employee dies as the result of a wrongful injury by the employer." *Halling* v. *Industrial Comm'n of Utah,* 71 Utah 112, 120–121, 263 P. 78, 80–81.

not a member of a group to whom the carrier might lawfully issue passes under the Hepburn Act. The *Schuyler* case held that the Hepburn Act did not deprive Schuyler, who violated it, "of the benefit and protection of the law of the State," because "such a violator" was "a human being, of whose safety the plaintiff in error [railroad] had undertaken the charge." Jack Francis and his wife were not violators of the Hepburn Act or any other act, federal or state. Each of them "was a human being of whose safety the railroad had taken charge." But by today's decision their children are denied the benefit of Utah's law. A federal rule of law is said to compel this Court to bar recovery under Utah's statute.

## III.

What is this federal rule of law? Where did a rule emanate which today constrains this Court, without appraisal of the rule's scope or merits, to deny these children a right to recover damages from a railroad that negligently killed their parents? I say "negligently killed" because that must be assumed since the Court affirms a judgment against the children in a case where the jury was denied a right to award damages for a killing caused by the "ordinary negligence" of the railroad.

The Court points to no records and I can find not a single shred of evidence that Congress has ever directly or indirectly, explicitly or impliedly, through the Hepburn Act, or through any other act, authorized railroads to contract against liability for their negligence which results in the injury or death of a railroad employee or any other person legally riding on a railroad pass. The original rule followed in an expanded form by the Court today is actually a judicial product of the old days of *Swift* v. *Tyson,* 16 Pet. 1 (1842), days in which federal courts invoked "a transcendental body of law outside of

any particular State . . . using their independent judgment as to what it was." Holmes, J., dissenting, *Black & White Taxi. Co.* v. *Brown & Yellow Taxi. Co.,* 276 U. S. 518, 533.

As already pointed out, our decision in *Erie R. Co.* v. *Tompkins, supra,* repudiated *in toto* the old *Swift* v. *Tyson,* "transcendental" or "general commercial law" power of federal courts. But as I see this case, the Court now perpetuates and strengthens the old rule based on the repudiated *Swift* v. *Tyson* doctrine, and the rule applied today rests on no other foundation than a completely uncritical adoption of this Court's 1904 "independent judgment." That judgment held it to be bad public policy, indeed, offensive to the Court's "moral sense," for a state to provide that an injured passenger who rode on a wholly gratuitous and guest basis could recover damages if a railroad had cautiously stipulated in advance that such a free passenger must assume the risks of railroad negligence. An investigation of the evolution of the "rule" from its 1904 beginning and application to its much broader application today will demonstrate, I believe, that it is rooted now, as in 1904, in nothing but the original "transcendental general law" source.

## IV.

The background of the 1904 rule throws light on its judicial "general law" origin. In 1852 this Court was unable to find any difference between the kind of duty owed by a railroad to its paying and non-paying passengers; "public policy and safety" were held to require that a railroad exercise "the greatest possible care and diligence" for the safety of all passengers, and any less measure of care entitled an injured passenger to recover. *Philadelphia & Reading R. Co.* v. *Derby,* 14 How. 468,

485–486.[4]   This principle was reaffirmed the next year in a water carriage case "as resting, not only on public policy, but on sound principles of law." *The Steamboat New World* v. *King,* 16 How. 469, 474; and see to the same effect *Railroad Company* v. *Lockwood,* 17 Wall. 357, 382–383.   In 1873, this Court in an elaborate and well-reasoned opinion held that it was against the public interest and public policy to permit common carriers to stipulate against the results of the negligence of themselves or their agents, and that while the rule applied both to carriage of goods and passengers, it applied with "special force to the latter." *Railroad Company* v. *Lockwood, supra* at 384.   The passenger in the *Lockwood* case was a drover traveling on a free pass to look after cattle; the Court reserved decision as to whether the rule would apply to a strictly free passenger.   Four years later the Court applied the same reasoning to a railroad-designated "free pass" passenger, finding that in fact there was consideration for the carriage and that it was not a "matter of charity" or a "mere gratuity." *Railway Company* v. *Stevens,* 95 U. S. 655, 658, 660.   The *Lockwood* and *Stevens* cases plainly stand for the principle that where there is any benefit derived by the railroad a pass is not "free," and that a passenger riding on such a pass may

---

[4] The Court said: ". . . It is true, a distinction has been taken, in some cases, between simple negligence, and great or gross negligence; and it is said, that one who acts gratuitously is liable only for the latter.   But this case does not call upon us to define the difference, (if it be capable of definition,) as the verdict has found this to be a case of gross negligence.

"When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence.   And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of the passengers should not be left to the sport of chance or the negligence of careless agents.   Any negligence, in such cases, may well deserve the epithet of 'gross.' "

recover for injuries due to the railroad's negligence, regardless of stipulations in his pass.

In the *Lockwood* case this Court refused to follow decisions of the Supreme Court of New York, the State where the carriage contract was made and where the accident occurred, but instead, since there was no controlling New York statute, expressly decided the point as one of "general commercial law." 17 Wall. at 368. And see *Chicago, Milwaukee & St. P. R. Co.* v. *Solan,* 169 U. S. 133, 136–137. Out of this "general commercial law" background emerged the "rule" relied on by the Court in the *Adams* case.

## V.

The beginning of the doctrine that a railroad could by stipulation exempt itself from liability for negligent injury to strictly free passengers was in *Northern Pac. R. Co.* v. *Adams, supra,* and *Boering* v. *Chesapeake Beach R. Co.,* 193 U. S. 442, both decided in 1904. The decisions in these cases bear internal proof that they rested on the "general commercial law" ground. The *Adams* opinion treated the newly announced doctrine as no more than a special exception to the rule of "general commercial law" of the *Lockwood* case, which rule denied railroads power to exempt themselves from the effects of their negligence through the device of "free" passes.

As bearing on the narrow scope of the *Adams* rule and its "transcendental law" origin, it is of importance that the *Adams* and *Boering* cases were decided in 1904, two years before Congress outlawed political passes in the Hepburn Act. There existed at that time a widespread hostility to the use of "strictly free" railroad passes. The pass in the *Boering* case as well as in the *Adams* case was "strictly free." Adams, the deceased, was a lawyer but not employed by the railroad that gave him the pass. Many believed, as shown by the legislative history of the

Hepburn Act, that railroads were using passes to influence public men to favor railroads at the expense of the public good. Consequently, pass givers and pass users of "strictly free" passes, as distinguished from givers and users of employees' passes, were in bad repute. The *Adams* and *Boering* decisions plainly reflect this sentiment. Both decisions spotlighted the importance of having "those who accept gratuities and acts of hospitality" stand by their contracts to assume the risks of injury incident to riding. In the *Lockwood* and *Stevens* cases, where no money was paid for passage, but neither carriage was strictly free, interests of the public in a carefully operated railroad system were expressly held to outweigh sanctity of contracts and all other considerations; in the *Adams* and *Boering* cases, sanctity of contracts, particularly contracts made to obtain strictly free transportation, was given greater weight than the public's interest in safe transportation.[5] But all the cases alike turned out judge-made rules of "general commercial law." Now let us follow the *Adams* rule to its appearance in other cases relied on by the Court today for the statement that this rule of "general commercial law" has become part of the "warp and woof" of the Hepburn Act.

*Charleston & W. C. R. Co.* v. *Thompson*, 234 U. S. 576, is the next case relied on here. It was decided in 1914, eight years after passage of the Hepburn Act, which had, with certain exceptions, prohibited issuance of passes by railroads. 34 Stat. 584, 49 U. S. C. § 1 (7). The suit was brought by the wife of a railroad employee to recover for injuries sustained by her while an interstate railroad

---

[5] A note appended to the *Lockwood* case as reported in 21 L. Ed. 627 cites cases in support of the position there taken that the *Adams* rule was contrary to the weight of judicial authority. And see 22 L. R. A. 794; 37 L. R. A. (N. S.) 235; 37 Ann. Cas. 623.

passenger riding on a pass. The Court of Appeals of Georgia considered it to be the general rule that strictly free pass passengers could not recover for injuries if their passes contained a stipulation requiring the passenger to assume the risk of railroad negligence. But that court went on to hold that the Hepburn Act, by specifically authorizing issuance of passes to railroad employees and their families, had put them in a different category from "purely gratuitous" passengers. The court regarded passes issued to members of an employee's family as partial compensation for the employee's services, and for that reason distinguished persons riding on such passes from strictly free pass passengers, to whom the harsh *Adams* rule applied. 13 Ga. App. 528, 80 S. E. 1097. This Court reversed, saying that "The main question is whether when the statute permits the issue of a 'free pass' to its employés and their families it means what it says." It did not find that the pass on which the injured wife of the employee had ridden was free in fact, but held that the "pass was free under the statute," thereby treating employees' passes as though they were strictly free, without stating any reason except that the Hepburn Act had referred to passes as "free." *Cf. Norfolk Southern R. Co. v. Chatman,* 244 U. S. 276, 280–281. The Court then went further and upheld the pass stipulations for railroad exemption from liability for negligence. But the Court did not at all rely on the Hepburn Act for this latter holding. Instead it was said that "As the pass was free under the statute . . . the validity of its stipulations" was "established by the decisions of this court," relying completely upon the *Adams* and *Boering* cases. Thus the *Charleston & W. C. R. Co.* case did not discover the *Adams* rule in an act of Congress; the rule it relied on had been judicially created in 1904 by an exercise of the Court's "transcendental" law power.

*Kansas City So. R. Co.* v. *Van Zant,* 260 U. S. 459, decided in 1923, is the next and the last case relied on by the Court today. That case decided that the "incidents and consequences" of an employee's pass raise a federal question. *Cf. Southern Pac. Co.* v. *Schuyler,* 227 U. S. 601, 610; *Chicago, R. I. & P. R. Co.* v. *Maucher,* 248 U. S. 359, 363. It then repeated the statement made in *Charleston & W. C. R. Co.* v. *Thompson, supra,* that an employee's pass transportation is "free," again without any explanation of why. To this extent it may be said that the Court was then construing the Hepburn Act, though I think its construction was wrong. But the Court did not, even in this last case (1923), hold or intimate that the Hepburn Act of itself put employee-pass passengers in a separate class, to be negligently killed or injured with impunity. To degrade railroad employee passengers to this unfortunate level this Court in the *Van Zant* case again relied on the rule it had fashioned in the *Adams* and *Boering* decisions. So long as one agreed with the soundness of the *Adams* case rule and with this Court's exercise of a power to declare "general commercial law" under the *Swift* v. *Tyson,* doctrine, the result of the *Van Zant* case could not be questioned in 1923. But that was fifteen years prior to *Erie R. Co.* v. *Tompkins, supra,* in which we abandoned the "transcendental" law doctrine, as typified by the *Adams* rule, and today's decision is ten years after we took that salutary step.

In applying this pre-*Erie-Tompkins* court-made transcendental law rule at this time, the Court not only in part neutralizes our *Erie-Tompkins* decision. It actually leaves a rule standing which might have already fallen under the repudiated *Swift* v. *Tyson* doctrine so far as it governed. For though a purely transcendental law rule judicially created by this Court under the pre-*Erie-Tompkins* doctrine was "none the less the law of the

State," it need only have remained the "law of the State" until "changed by its legislature." *Chicago, Milwaukee, & St. P. R. Co.* v. *Solan,* 169 U. S. 133, 136–137. Hence, had the *Swift-Tyson* doctrine not been repudiated, the *Adams* rule as applied to persons injured in Utah should have fallen of its own weight had the Utah legislature passed a law authorizing a man's children to recover from a railroad that negligently killed their parents while they were "free pass" passengers. Utah has a statute broad enough to authorize such recoveries. The only barrier to recovery under that state statute is grounded on a court-announced "commercial law" rule, a poor excuse indeed for depriving a state of exercising its traditional power to control actions for local wrongful deaths. Of course this is an interstate carrier and we should not constrict congressional powers over it by narrow statutory interpretations. *Cf. Federal Trade Comm'n* v. *Bunte Bros.,* 312 U. S. 349. But the very absence of a federal statute to take the place of local wrongful death statutes should be the equivalent of a loud congressional warning to courts to refrain from encroaching on state powers here.

## VI.

It is said however that Congress, although aware of the *Adams* transcendental law rule, has never changed it. Indulging for the moment the convenient fiction that Congress knows all about that rule and what it means, why should it think that old rules laid down by this Court and based on the *Swift* v. *Tyson* doctrine could survive our decision in *Erie* v. *Tompkins?* And why should Congress think that a rule which had never been applied by this Court to bar the children of a deceased employee would be extended to bar recovery by those children? I venture the suggestion that it would be shocking to members of Congress, even those who are in closest touch with

interstate commerce legislation, to be told that their "silence" is responsible for application today of a rule which is out of step with the trend of all congressional legislation for more than the past quarter of a century. There are some fields in which congressional committees have such close liaison with agencies in regard to some matters, that it is reasonable to assume an awareness of Congress with relevant judicial and administrative decisions. But I can find no ground for an assumption that Congress has known about the *Adams* rule and deliberately left it alone because it favored such an archaic doctrine.[6] I reject the idea that Congress ever has approved such a rule, and none of its legislation for the past quarter of a century indicates that it ever would have approved it.

## VII.

The legislative history of the Hepburn Act's free pass provision shows that application of the *Adams* doctrine to employees' passes is not in accordance with but directly hostile to the congressional purpose in permitting employee passes. That Congress never would have passed an Act which so penalized employees, may be seen by reading even the few portions of the Congressional Rec-

---

[6] The Transportation Act of 1940, 54 Stat. 899, 900, 49 U. S. C. 1 (7), expanded the groups eligible to ride on "free passes." But no language used in that Act and no legislative history that I have found indicates any congressional knowledge of the existence of the penalizing *Adams* rule, much less approval of it. Far from indicating a purpose to acquiesce in any kind of reduced employee protection, Congress in § 7 (2) (f) of that Act, 49 U. S. C. § 5 (2) (f), provided a new and extraordinary protection for employees whose jobs might be affected by railroad mergers and consolidations. See Sen. Rep. No. 433, 76th Cong., 1st Sess., 4, 21; H. R. Rep. No. 2832, 76th Cong., 3d Sess., 68–69; *Interstate Commerce Comm'n* v. *Railway Labor Assn.,* 315 U. S. 373, 379–380.

ord and committee reports cited below.[7]  In very brief summary that history shows:

Prior to 1906, there grew up a demand by the people that railroads cease discriminating against some shippers in favor of others and cease using free passes as a means to obtain special favors from public officials and administrative agencies.  Public complaint was not against employees using passes.  In fact, some unions had bargaining agreements for passes, and Congressmen who spoke on the Hepburn bill considered employees' passes to be a part of the inducement to work for railroads.  Passes were spoken of by those who discussed legislation on the House and Senate floors as part of the compensation of employees.  The subject was an important one and was so treated.  At one time a conference report recommended to both houses that all passes be prohibited.  40 Cong. Rec. 7741.  This report was defeated and the debates in-

---

[7] 40 Cong. Rec. 7741, 7851–7852, 7920–7940, 7978–7998.  The following statement is typical of the sentiment that brought into the Hepburn Act the exception that permitted issuance of passes to and use of them by employees: "While I am on my feet I will take the opportunity to say in regard to the pass amendment or provision that I have received, as other Senators have, a great many telegrams from railway employees and from organizations of railway employees protesting against any provision being incorporated here that will prevent them from being supplied with or from accepting free transportation. I shall not take time to discuss that, as it has been fully discussed. I simply wish to say that I fully agree with them, and I believe that we ought not to enact any such legislation, and should we do so it would, in my judgment, be perpetrating a very great injustice upon those people.  The matter of free transportation, as the Senator from Wisconsin [Mr. Spooner] said yesterday, enters partly into the consideration for their employment, and we have no moral right to deprive them of that privilege." 40 Cong. Rec. 7981.  See also *id*. at 7984–7985.  See Sen. Rep. No. 1242, 59th Cong., 1st Sess., Views of Mr. Tillman and Mr. Newlands, pp. 10, 16; 1 Sharfman, The Interstate Commerce Commission 44 (1931); *Sassaman* v. *Pennsylvania R. Co.*, 144 F. 2d 950, 956, nn. 7 and 8.

dicate that it would have been difficult to pass a bill which failed to permit issuance of passes to railroad employees—not in the spirit of giving alms to beggars or favors to politicians, but to requite men for faithful work.

If any senator or congressman discussing the Hepburn Act had ever heard of the *Adams* rule, he failed to mention it. But it must be conceded there was no reason for him to mention it, since the purposes of the Act bore no relation, directly or remotely, to liability of a railroad for injury to passengers whether riding on passes or paying their fares. Even if some member of Congress had been acquainted with the *Adams* rule and had thought that the Hepburn Act bore some remote relation to the liability of railroads for injury to passengers, still he would have had no reason to believe this Court would subsequently expand that rule, then applicable only to "strictly free pass" passengers, to penalize employees and others authorized by Congress to ride on passes. As I see it, today's decision undermines the purpose Congress had in mind in approving the long-standing practice of employees' passes. It perverts an advantage expressly saved to employees into a penalty for making use of it. It makes traps of these passes.

## VIII.

Moreover, the subjection of railroad employees while passengers to the hazards of uncompensated injuries is at war with the basic philosophy which has found expression in other industrial and social legislation for many years. Employers' liability acts, compensation acts, social insurance legislation of the federal government and various states, and a host of other legislative policies have been grounded upon the basic premise that care of the accidentally injured should be accepted as a matter of great public concern. Congress has also erased every vestige of the old judicially created fellow-servant and

assumption-of-risk doctrines in connection with suits by railroad employees on account of injuries suffered in the course of their employment. *Tiller* v. *Atlantic C. L. R. Co.*, 318 U. S. 54. The analogy between these now repudiated judicially created tort-law doctrines and the present rule was pressed on the Court in briefs for the railroad in the *Adams* case. Congress has also emphatically outlawed all kinds of stipulations and contracts to exempt railroads from liability for their negligence in Employers' Liability Act cases. *Duncan* v. *Thompson*, 315 U. S. 1. All of this body of legislation, and much more to which reference could be made, has departed from the premise of the *Adams* and *Boering* decisions that it is more important to society that men abide by ticket and contract stipulations [8] than it is to have a system which provides compensation for the industrially injured and the dependents of those who are killed. For our society attempts to take care of its aged, unemployed, crippled and disabled, as well as the dependents of those killed by our industrial machine. See *Georgetown College* v. *Hughes*, 76 U. S. App. D. C. 123, 130 F. 2d 810, 822–825; *Interstate Commerce Comm'n* v. *Railway Labor Assn.*, 315 U. S. 373, 376–378. And the present railroad regulatory system is such that payment by railroads for injuries inflicted by them upon passengers is just as certainly borne by the public as though those injured and their dependents were directly supported by governmental institutions.

Whether allowance of damages for negligent death is the best way to meet the problems incident to transpor-

---

[8] The *Boering* case was supported by the following statement: "The result we have reached conforms the law applicable to the present issue to that moral sense which justly holds those who accept gratuities and acts of hospitality to perform the conditions on which they are granted." 193 U. S. at 451.

470

tation dangers is beside the point. Many courts generally, including this one and Utah's, may have been wrong in thinking that the possibility of having to pay damages for deaths of passengers due to railroad negligence would make railroads more cautious.[9] Perhaps society could take care of injured passengers and their dependents in a less wasteful manner. But so long as Congress leaves the states free to adopt this method of meeting the problem, I think this Court should not handicap the states. Congress could provide a substitute for the state laws; we cannot.

## IX.

Today's decision leaves states free to provide that railroads must pay for injury or death of passengers who can and do pay a full money fare for passage. This group is far more likely to include some people who are better able financially to take care of themselves in case of injury than are the members of some of the other groups permitted by the Hepburn Act to ride on free passes, all of whom are penalized by today's decision. These groups are in addition to railroad employees and their families, employees of other railroads; ministers of religion; Young Men's Christian Association workers; inmates of eleemosynary institutions; indigent, destitute, and homeless persons; disabled soldiers; and others in analogous categories. In following a course today that

---

[9] *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 368. See *Jacobus* v. *St. Paul & C. R. Co.*, 20 Minn. 125, 130: "Whether the case be one of a passenger for hire,—a merely gratuitous passenger,—or of a passenger upon a conditioned free pass, as in this instance, the interest of the state in the safety of the citizen is obviously the same. The more stringent the rule as to the duty and liability of the carrier, and the more rigidly it is enforced, the greater will be the care exercised, and the more approximately perfect the safety of the passenger."

takes all of the above groups out from under the protection of state laws, the Court ignores the signs erected by Congress, all of which point in the opposite direction. Assuming the Court is right in saying that a rule with such consequences has become a part of the warp and woof of the Hepburn Act, it is a defective part which this Court alone has woven into the Act and which clashes with the congressionally fashioned fabric and design. The result is a motley pattern. I would restore the original congressional design.

No sound argument has been or can be advanced for application of the 1904 *Adams* rule in today's entirely different judicial and legislative environment, even as the rule was first narrowly applied to a purely gratuitous carriage, except that it was unquestioningly accepted 34 and 25 years ago in cases where the rule's soundness was not challenged. When precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it.

The *Van Zant* case did hold that since the Hepburn Act the "incidents and consequences" of an employee's pass raised a federal question. It then held that the user of an employee's pass must stand by his contract to assume the risks of negligent injury by the railroad. Neither it, nor any other case since the Hepburn Act, until the case today, has held that the penalizing consequences of the father's contract must be visited upon his children. I would not so extend the more than dubious *Van Zant* doctrine.