2006 ND 57

**Theresa L. SACK, Plaintiff, Appellee and Cross–Appellant**

v.

**Trent D. SACK, Defendant, Appellant and Cross–Appellee.**

No. 20050167.

Supreme Court of North Dakota.

March 29, 2006.

Joseph J. Cichy (argued), Joseph J. Cichy, P.C., and Orell Schmitz (on brief), Bismarck, N.D., for defendant, appellant and cross-appellee.

Daniel H. Oster, Neubauer & Oster, Bismarck, N.D., for plaintiff, appellee and cross-appellant.

CROTHERS, Justice.

[¶ 1] Trent Sack appeals from that portion of a district court judgment and divorce decree awarding Theresa Sack rehabilitative spousal support for six years. He argues Theresa is not a "disadvantaged spouse" and is not entitled to support. Theresa cross-appeals from that portion awarding Trent certain personal property in the court's property division. We affirm the district court's judgment.

I

[¶ 2] Theresa Sack brought this divorce action in 2003. Trent and Theresa were married in 1998 and had lived together since 1993. Three children were born of the marriage.

[¶ 3] When the couple met in 1993, Trent was attending technical college receiving training in heavy equipment operation and Theresa was attending business college studying secretarial work. Trent completed his studies. Theresa claims Trent told her "anybody can get a job, that a certificate wouldn't do it," prompting her to quit school in 1994. Trent denies discouraging Theresa from continuing her education. Theresa did not attempt to resume her education either before or during the marriage.

[¶ 4] Trent earns approximately $60,000 annually working at a mine. Theresa held numerous seasonal or temporary positions during the marriage. Her ability to work full time was limited by Trent's volatile shift schedule. Theresa largely stayed home with the children and worked in positions that were part time or short term and paid an hourly rate high enough to cover daycare expenses. Theresa earned no more than $18,500 annually during the course of the marriage and was unemployed at the time of trial.

[¶ 5] Trent and Theresa stipulated Theresa would retain primary custody of the children and court-ordered visitation was not necessary. The district court ordered Trent to pay child support and divided the marital property. The district court ordered spousal support for Theresa, finding she was a "disadvantaged spouse" because of her lower income earning capacity and her time spent largely as a stay-at-home mother.

## II

[¶ 6] A district court's spousal support determinations are findings of fact that are disturbed on appeal only if they are clearly erroneous. N.D.R.Civ.P. 52(a); *Sommer v. Sommer*, 2001 ND 191, ¶ 8, 636 N.W.2d 423. Trent argues the district court's spousal support determination was clearly erroneous because the court failed to adequately make the required finding that Theresa was a "disadvantaged spouse," citing *Riehl v. Riehl*, 1999 ND 107, ¶ 9, 595 N.W.2d 10. Theresa argues the district court did make a finding of her "disadvantage" and also posits there are no "rigid rules for determining whether or not to award [spousal support]," other than the *Ruff–Fischer* guidelines. In support, Theresa cites our decisions in *Beals v. Beals*, 517 N.W.2d 413, 416 (N.D.1994) and *Ingebretson v. Ingebretson*, 2005 ND 41, ¶ 7, 693 N.W.2d 1. Because of the issues framed by the parties, together with our duty to correctly apply the law, it is necessary to examine whether the separate "disadvantaged spouse" finding remains a viable requirement before we reach the question whether the district court's determination was clearly erroneous.

[¶ 7] "Disadvantaged spouse" was first used in North Dakota as a descriptive term.[1] We explained in *Bullock v. Bullock*, 376 N.W.2d 30, 31 (N.D.1985) that "Rehabilitative spousal support is designed to provide education, training, or experience that will enable the disadvantaged spouse to achieve 'suitable' and 'appropriate' self-support." The phrase was originally a label for the party in a divorce who would be receiving support, *id.*, and was used by this Court in a descriptive sense for nearly a decade. *See Rustand v. Ru-*

stand, 379 N.W.2d 806, 807 (N.D.1986); *Hanson v. Hanson*, 404 N.W.2d 460, 466 (N.D.1987); *Roen v. Roen*, 438 N.W.2d 170, 172 (N.D.1989); *Wahlberg v. Wahlberg*, 479 N.W.2d 143, 144–45 (N.D.1992); *Beals*, 517 N.W.2d at 416.

[¶ 8] This complementary relationship between "rehabilitative spousal support" and "disadvantaged spouse" ended with *Wiege v. Wiege*, 518 N.W.2d 708, 711 (N.D. 1994), when "disadvantaged spouse" was changed from a description to a requirement. *Wiege* first stood for the proposition that a "spouse *must be disadvantaged* as a result of the divorce for rehabilitation or maintenance to be appropriate." *Id.* (emphasis added).

[¶ 9] Since *Wiege*, the "disadvantaged spouse" requirement has continued to evolve and now mandates that "the district court must find the requesting spouse to be 'disadvantaged,'" by assessing whether the spouse has "'forgone opportunities or lost advantages as a consequence of the marriage and . . . has contributed during the marriage to the supporting spouse's increased earning capacity.'" *Weigel v. Weigel*, 2000 ND 16, ¶ 11, 604 N.W.2d 462 (citations omitted).

[¶ 10] Here, the district court found Theresa was a "disadvantaged spouse" entitled to spousal support by virtue of her years spent as a homemaker and her lack of full-time employment throughout the marriage. Trent argues Theresa was not a disadvantaged spouse entitled to support because she did not directly contribute to his increased earning capacity. We disagree with the suggestion that Theresa's contributions as a homemaker and caretaker for the children did not directly help Trent advance to his cur-

---

1. Although earlier cases referenced one spouse's "disadvantage," *e.g.*, *Bingert v. Bingert*, 247 N.W.2d 464 (N.D.1976), the phrase "disadvantaged spouse" did not appear in our case law until 1985.

rent position and salary. Theresa is therefore "disadvantaged" under the current law. However, we find ourselves unable to explain why such a separate finding must be made.

[¶ 11] Any spousal support award is supposed to be based upon consideration of the *Ruff–Fischer* guidelines. *Ingebretson*, 2005 ND 41, ¶ 7, 693 N.W.2d 1. *Ruff–Fischer* evaluates the propriety and necessity of spousal support, weighing:

> the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.

*Staley v. Staley*, 2004 ND 195, ¶ 8, 688 N.W.2d 182 (citing *Sommer*, 2001 ND 191, ¶ 9, 636 N.W.2d 423). *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952); *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966). Because such a thorough weighing of factors by the district court is already required through *Ruff–Fischer*, we cannot reasonably justify requiring a separate proof of "disadvantage." Such a requirement appears to be no more than a repetitive and onerous exercise for the parties and the courts, which are already faced with considerable procedural and substantive burdens. Nor is a separate test consistent with our case law which has clearly, though sporadically, emphasized the lack of "rigid rules for determining whether or not to award [spousal support] and the amount of such an award." *Beals*, 517 N.W.2d at 416.

[¶ 12] "When precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it." *Francis v. Southern Pac. Co.*, 333 U.S. 445, 471, 68 S.Ct. 611, 92 L.Ed. 798 (1948) (Black, J., dissenting). We are unable to justify what has grown into the "disadvantaged spouse" doctrine and its overshadowing, if not obliteration of the underlying concept of rehabilitative spousal support. Therefore, we elect to dispose of the "disadvantaged spouse" doctrine and reemphasize the importance of a comprehensive analysis under the *Ruff–Fischer* guidelines when determining the appropriateness of rehabilitative spousal support. In doing so, we do not retreat from the reasons and rationale for rehabilitative support. Rather, we are directing focus back onto the *Ruff–Fischer* guidelines and away from a sub-test or further potential development of a separate or free-standing "disadvantaged spouse doctrine."

[¶ 13] Employing the *Ruff–Fischer* guidelines, Theresa was entitled to rehabilitative spousal support. Theresa has a substantially lower income-earning capacity than Trent, capable of making only minimum wage, compared to Trent's current income of $60,000. The marriage was relatively short-term, but the parties had lived together for a total of ten years. Trent is in good health, but Theresa has a number of health problems requiring regular treatment. Theresa has very little property and significant debt, while Trent has a house and other assets. Under *Ruff–Fischer*, therefore, the district court did not err by concluding Theresa was entitled to rehabilitative support.

[¶ 14] We find the district court did not abuse its discretion in awarding Theresa support due to her status as a "disadvantaged spouse" because that same analysis supports the award under the

*Ruff–Fischer* guidelines. However, we overrule *Wiege* and its progeny inasmuch as they require a separate or independent "disadvantaged spouse" finding as a prerequisite to awarding rehabilitative support.

## III

[¶ 15] Theresa argues some specific items of personal property should have been awarded to her in the property distribution. A district court's determinations on valuation and division of property are findings of fact which are reversed on appeal only if they are clearly erroneous. *Kautzman v. Kautzman,* 1998 ND 192, ¶ 8, 585 N.W.2d 561.

[¶ 16] Theresa stated in court that Trent could have the particular items at the values he had given them. Therefore, the district court's decision to award Trent these items is supported by the record and not clearly erroneous.

## IV

[¶ 17] We affirm the judgment of the district court awarding Theresa rehabilitative spousal support and distributing the marital property.

[¶ 18] MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.

I concur in the result GERALD W. VANDE WALLE, C.J.

SANDSTROM, Justice, dissenting.

[¶ 19] The majority radically alters our divorce law by abandoning the requirement of a disadvantaged spouse before spousal support can be awarded. I dissent for four reasons. First, the parties did not raise the issue here or in the court below. Second, abandoning the disadvantaged spouse requirement is unnecessary to resolve this case. Third, the majority misapprehends the history and legal basis for the disadvantaged spouse requirement for spousal support. Fourth, the majority's action is contrary to clear legislative intent.

## I

[¶ 20] The parties did not raise the issue here or in the court below. In this case, Trent Sack argued only that Theresa Sack was not a disadvantaged spouse and attempted to distinguish this case from this Court's past cases on the disadvantaged spouse requirement. At no time did either party argue the disadvantaged spouse requirement had outgrown its usefulness or was superfluous in light of the *Ruff–Fischer* guidelines. We have repeatedly refused to address issues raised for the first time on appeal. *E.g., Wenzel v. Wenzel,* 469 N.W.2d 156, 158 (N.D.1991) ("We have repeatedly held that issues not raised in the trial court cannot be raised for the first time on appeal."). Furthermore, this Court does not decide cases on the basis of arguments not brought before it. *See Owens v. State,* 2001 ND 15, ¶ 32, 621 N.W.2d 566 ("We decide only issues which have been thoroughly briefed and argued."). The majority has impermissibly extended its reach into an issue not properly before this Court.

## II

[¶ 21] Abandoning the disadvantaged spouse requirement is unnecessary to resolve this case. The majority affirms the district court's findings of fact, conclusions of law, and order for judgment. The district court addressed both the disadvantaged spouse requirement and the *Ruff–Fischer* guidelines and decided Theresa Sack was a disadvantaged spouse entitled to spousal support. The award of spousal support was not clearly erroneous. Therefore, this case has not presented a need to

reevaluate the disadvantaged spouse requirement, and the majority did not need to address the issue. Issues unnecessary to resolving an appeal need not be addressed. *Olander Contracting Co. v. Gail Wachter Investments*, 2002 ND 65, ¶ 48, 643 N.W.2d 29. Further, it is imprudent to decide a significant issue without briefing and argument. *E.g., Owens*, 2001 ND 15, ¶ 32, 621 N.W.2d 566 ("We decide only issues which have been thoroughly briefed and argued."); *Sande v. City of Grand Forks*, 269 N.W.2d 93, 99 (N.D.1978) ("We are therefore reluctant to base an opinion upon failure to file a claim within a short period, in the absence of briefing and argument on the possible constitutional question.").

### III

[¶ 22] The majority misapprehends the history and legal basis for the disadvantaged spouse requirement for spousal support. The majority apparently believes this Court manufactured the "disadvantaged spouse" doctrine out of whole cloth in 1985 for no apparent reason. In fact, as Professor Marcia O'Kelly of the University of North Dakota School of Law has explained, the doctrine was announced years earlier to save the constitutionality of spousal support.

[¶ 23] The majority states at ¶ 7 that " 'disadvantaged spouse' was first used in North Dakota as a descriptive term," citing *Bullock v. Bullock*, 376 N.W.2d 30, 31 (N.D.1985). This statement misses nine years and eleven prior opinions of this Court's relying on the relationship between spousal support and the disadvantaged spouse.

[¶ 24] Professor O'Kelly outlined the history of spousal support. Marcia O'Kelly, *Entitlements to Spousal Support After Divorce*, 61 N.D. L.Rev. 225 (1985). Professor O'Kelly explains that historically,

alimony was a continuation of the husband's duty to support his wife. *Id.* at 235.

> Before 1976, North Dakota cases reflected unqualified acceptance of statutory alimony as the common-law concept of continuation after divorce of the husband's duty to support and maintain his wife during marriage.

*Id.* Professor O'Kelly points out that this concept was explicitly endorsed by this Court in *Nugent v. Nugent*, 152 N.W.2d 323, 327 (N.D.1967). O'Kelly, *supra*, at 235 n. 50.

[¶ 25] But the legal landscape changed in 1971, when the United States Supreme Court, in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), "decided for the first time that the equal protection clause of the Constitution significantly limits the power of government to differentiate treatment, entitlements, or duties on the basis of gender." O'Kelly, *supra*, at 240. Professor O'Kelly explains that the "court correctly recognized the need to replace the old notion of marital support in order to preserve the constitutionality of the alimony statute" when the alimony statute of North Dakota was challenged as impermissibly discriminating against husbands on the basis of sex. *Id.* at 241 (discussing *Bingert v. Bingert*, 247 N.W.2d 464 (N.D.1976)).

[¶ 26] It was in *Bingert v. Bingert*, that this Court first discussed the concept of a disadvantaged spouse and spousal support. 247 N.W.2d at 468. The issue before the Court was whether the alimony statute of North Dakota impermissibly discriminated against husbands on the basis of sex. *Id.* at 466. The appellant argued North Dakota's alimony statute, located at that time in N.D.C.C. § 14–05–24, was unconstitutional because it was based in part on the husband's common-law duty to support his wife during marriage, which he contended

was also unconstitutional sex discrimination. *Id.* at 468. Upholding the constitutionality of North Dakota's alimony statute, this Court concluded the duty to pay spousal support was not a continuation of the husband's duty to support his wife during marriage, but was an independent duty. *Id.* at 468–69. In doing so, Justice Vogel stated, "We believe that the trend in modern domestic-relations law is to treat alimony as a method for rehabilitating the party *disadvantaged by the divorce.* This seems to be the basis of the Uniform Marriage and Divorce Act, adopted in at least four States, not including North Dakota." *Id.* at 469 (emphasis added). The Court ultimately held that North Dakota's spousal support statute was neutral on its face regarding sex, applied equally to men and women, and therefore, passed constitutional muster. *Id.*

[¶ 27] Since 1976 and prior to *Bullock* in 1985, this Court continued discussing the need of a disadvantaged spouse in spousal support cases. *See Nastrom v. Nastrom,* 262 N.W.2d 487, 491 n. 1 (N.D. 1978); *Carr v. Carr,* 300 N.W.2d 40, 46 (N.D.1980); *Williams v. Williams,* 302 N.W.2d 754, 758 (N.D.1981); *Jochim v. Jochim,* 306 N.W.2d 196, 199 (N.D.1981); *Svetenko v. Svetenko,* 306 N.W.2d 607, 611 (N.D.1981); *Martin v. Martin,* 307 N.W.2d 541, 544 (N.D.1981); *Herrick v. Herrick,* 316 N.W.2d 72, 75 (N.D.1982); *Gooselaw v. Gooselaw,* 320 N.W.2d 490, 493 (N.D.1982); *Briese v. Briese,* 325 N.W.2d 245, 249 (N.D.1982); *Smith v. Smith,* 326 N.W.2d 697, 700 (N.D.1982); *Jondahl v. Jondahl,* 344 N.W.2d 63, 72 (N.D.1984); *Seablom v. Seablom,* 348 N.W.2d 920, 924 (N.D.1984).

[¶ 28] Without recognizing the legal or historical significance of the disadvantaged spouse requirement, the majority now spontaneously and without warning casts it aside as superfluous next to the *Ruff–Fischer* guidelines. The majority incor-rectly notes the time the disadvantaged spouse concept gained prominence in the law. Then, it trivializes it, stating this Court used it as "a descriptive term," rather than an emerging trend in the law. And finally, without discussing whether modern spousal support jurisprudence has changed again, the majority discounts the disadvantaged spouse requirement as no longer needed. I would not cast aside so readily a concept of the law that is well established in caselaw and emerged to meet changing societal norms.

IV.

[¶ 29] Finally, the majority's action is contrary to clear legislative intent of the North Dakota Legislative Assembly.

[¶ 30] The requirement that a person be a disadvantaged spouse in order to be entitled to receive spousal support has been settled caselaw in North Dakota for 30 years.

[¶ 31] "It is a settled rule of statutory construction that when a statute or a clause or provision thereof has been con-strued by a court of last resort, and the same is substantially reenacted, the legis-lature may be regarded as adopting such construction." *Lembke v. Unke,* 171 N.W.2d 837, 852 (N.D.1969); *see also* 73 Am.Jur.2d *Statutes* § 221 (2001) ("Since it is presumed that the legislature knew a construction, long acquiesced in, given by the courts to a statute reenacted by the legislature, there is a presumption of an intention to adopt the construction as well as the language of the prior enactment.").

[¶ 32] Such a reenactment has oc-curred in North Dakota resulting in legis-lative adoption of the disadvantaged spouse requirement. In 2001, the Legisla-tive Assembly amended and reenacted N.D.C.C. § 14–05–24 and adopted N.D.C.C. § 14–05–24.1, which separated North Dakota's property division and

spousal support statutes. 2001 N.D. Sess. Laws ch. 149, § 10; 2001 N.D. Sess. Laws ch. 150, § 1. Senate Bill 2046, the bill that enacted a new statute for spousal support, was intended to be a house-keeping measure, simply intended to "clean up and coordinate" the family law statutes without making any substantive changes. *Hearing on S.B.2046 Before the Senate Judiciary Comm.*, 57th N.D. Legis. Sess. (Jan. 24, 2001) (testimony of Sherry Mills Moore, State Bar Ass'n of N.D. Family Law Task Force); *Hearing on S.B.2046 Before the House Judiciary Comm.*, 57th N.D. Legis. Sess. (Mar. 14, 2001) (testimony of Sherry Mills Moore, State Bar Ass'n of N.D. Family Law Task Force).

[¶ 33] The disadvantaged spouse requirement was adopted by this Court long before the 2001 statutory amendments. The legislature adopted a new spousal support statute that was intended to clean up the family law statutes, and it did not intend any substantive change to spousal support law. We presume the legislature knew of this Court's application of the disadvantaged spouse requirement and intended to adopt it when it amended the family law statutes in 2001. Therefore, the majority has now altered law that the legislature acquiesced to without any indication from the legislature that a change of law was needed.

V

[¶ 34] In conclusion, the majority has extended its reach further than necessary or appropriate for this case. The majority raises on its own and dispatches without briefing or argument the issue of whether the disadvantaged spouse requirement should be abandoned, an issue not properly before this Court and the resolution of which is unnecessary to resolve this case. The majority changes the law while misapprehending the history and legal basis for the disadvantaged spouse requirement and defying the intent of the legislature. Therefore, I dissent.

[¶ 35]   DALE V. SANDSTROM, J.