2011 ND 107

**Ricky C. BECKER, Plaintiff
and Appellant**

v.

**Jill M. BECKER, Defendant
and Appellee.**

No. 20100225.

Supreme Court of North Dakota.

June 21, 2011.

Irvin B. Nodland, Bismarck, N.D., for plaintiff and appellant.

Sherry Mills Moore, Bismarck, N.D., for defendant and appellee.

CROTHERS, Justice.

[¶ 1]  Ricky Becker appeals from a divorce judgment awarding Jill Becker spousal support and establishing her child support obligation.  We affirm the spousal support award, reverse the child support decision and remand for recalculation of Jill Becker's child support obligation.

I

[¶ 2]  Ricky and Jill Becker married in 1989 and have four children together. Ricky Becker is a plastic surgeon in Bismarck and has his own medical practice. Jill Becker has a master's degree in speech pathology.  Jill Becker worked part-time as a speech pathologist during the marriage, but there were times when she did not work outside the home and she has not worked outside the home since 2003.  The parties own Spa D'Athena, a spa and hair salon in Bismarck.

[¶ 3]  In 2008, Ricky Becker filed for divorce.  The parties agreed Ricky Becker would have primary residential responsibility for the children and later agreed on property and debt distribution.  The parties agreed Jill Becker would receive ownership of Spa D'Athena.  Ricky and Jill Becker also own various business entities, including HST, LLC; Athena Properties, LLP; Gulch Executive, LLC; RC Becker Family Corporation; and Ricky C. Becker MD PC, which was later changed to Becker Plastic Surgery, LLC. The parties agreed Ricky Becker would receive the parties' interests in these entities.  The district court entered partial judgments incorporating the parties' agreements, but the parties reserved the issues of spousal support and child support for trial.

[¶ 4]  After a September 2009 hearing on the spousal support and child support, the court awarded Jill Becker spousal support of $7,000 per month for June 2010 through December 2012 and $6,000 per month thereafter until her death or remarriage.  The court found Ricky Becker's net income was more than three times that of Jill Becker's income and granted Jill Becker a downward deviation from the presumptively correct amount of child support under the child support guidelines.  The court ordered Jill Becker to pay Ricky Becker $500 per month in child support for each child, for a total of $2,000 per month. A judgment was entered, and an amended judgment was later entered to amend provisions providing for separate income withholding orders for spousal and child support.

II

[¶ 5]  Ricky Becker argues the district court erred in calculating his income for purposes of deciding whether to award spousal support and calculating Jill Becker's child support obligation.  He contends the court incorrectly interpreted the financial information and erred finding his income higher than it actually is.

[¶ 6]  A district court's findings of fact in calculating a child support obligation and deciding whether to award spousal support will not be reversed on appeal unless they are clearly erroneous. *Duff v. Kearns–Duff,* 2010 ND 247, ¶ 13, 792 N.W.2d 916 (spousal support findings); *Lauer v. Lauer,* 2000 ND 82, ¶ 3, 609 N.W.2d 450 (child support findings).  Income is a finding of fact. *See Montgomery v. Montgomery,* 2003 ND 135, ¶ 14, 667 N.W.2d 611.  A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, no evidence exists to support the finding, or this Court is convinced, based on the entire record, a mistake has been made. *Lauer,* at ¶ 3.

[¶ 7]  The parties provided the district court with copies of their 2004–2008 individual income tax returns and tax returns for some of the business entities.  The court reviewed the tax returns to determine which properties may be income producing and how much income they might produce.  The court averaged Ricky Becker's income over a five-year period and found his average income from his surgical practice is $457,222 per year.  The court also found Ricky Becker has an average annual income from consultation and surgi-

cal fees of $192,000. The court found these consultation and surgical fees were additional income, stating, "[Ricky Becker] also acknowledged at trial, that he, personally, would have been the recipient of any surgical or consultation fees, which were expensed out of the gross business receipts before arriving at the net taxable business income." The court could not determine from the parties' tax returns how the fees were treated for tax purposes.

[¶ 8] Ricky Becker contends the court erred in finding he had additional income from consultation and surgical fees. He contends the surgical and consulting fees were expenses his surgical practice pays to local hospitals to provide facilities and services related to surgeries. However, no evidence in this record establishes these consulting and surgical fees were payments to local hospitals related to surgical services. Ricky Becker testified the consulting fees listed on the Becker Plastic Surgery ("BPS") profit and loss statements were payments to the RC Becker Family Corporation for health insurance and other money for himself and the children, including paying the children wages for work they did for the business entities and paying for the children's activities, but later he testified the family corporation does not pay for health insurance. He testified contract labor payments from BPS could be payments made to him, but he was not sure, and expenses listed as draws on the profit and loss statements are money paid to him. Ricky Becker's accountant testified he did not know the purpose of the consulting and contract labor expenses. Evidence in this record supports the district court's findings about Ricky Becker's income.

[¶ 9] Furthermore, it is not clear from the court's decision that it included the consulting and surgical fees as income in deciding child support and spousal support. The court made findings about Ricky Becker's income for each year from 2004 until 2008. The court could not determine how the consulting or surgical fees were treated for tax purposes. The court found, "Dr. Becker's earning ability remains relatively constant at about $455,000 per year. It is likely significantly higher than that if the consultation and surgical fees or draws were added." When the court considered the parties' circumstances and necessities for purposes of spousal support, the court said, "Dr. Becker has an average monthly income from his medical practice of $38,000. (This does not include any consulting or surgical fees earned from the business but not treated as ordinary income, profit, or wages.)" The court did not make a specific finding about Ricky Becker's net income for child support. We address that shortcoming below. As to spousal support only, the court's decision was not based on the additional income Ricky Becker claims the court erred in calculating. The award of spousal support is based on evidence presented to the district court. We therefore conclude the court's findings about Ricky Becker's income and spousal support obligation are not clearly erroneous.

### III

[¶ 10] Ricky Becker argues the district court erred in reducing Jill Becker's child support obligation after finding she was entitled to a downward deviation from the guidelines because her income was less than one-third of his income. He contends the court erred in calculating Jill Becker's income and the court failed to deduct his spousal support payments from his income.

### A

[¶ 11] " 'Child support determinations involve questions of law which are

subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard of review.'" *Halberg v. Halberg*, 2010 ND 20, ¶ 8, 777 N.W.2d 872 (quoting *Verhey v. McKenzie*, 2009 ND 35, ¶ 5, 763 N.W.2d 113).

[¶ 12] The child support guidelines provide a schedule of child support amounts based on the obligor's net income. *See* N.D. Admin. Code § 75–02–04.1–10. The scheduled amount is presumed to be the correct amount of support. N.D. Admin. Code § 75–02–04.1–09. The district court must comply with the child support guidelines to determine an obligor's child support obligation, and a court errs as a matter of law if it fails to comply with the guidelines. *Heinle v. Heinle*, 2010 ND 5, ¶ 36, 777 N.W.2d 590. "'The interpretation and proper application of a provision of the child support guidelines is a question of law, fully reviewable on appeal.'" *Id.* (quoting *State ex rel. K.B. v. Bauer*, 2009 ND 45, ¶ 8, 763 N.W.2d 462). "'The failure to properly apply the child support guidelines to the facts involves an error of law.'" *Heinle*, at ¶ 36 (quoting *Bauer*, at ¶ 8).

[¶ 13] The child support guidelines require the support order "include a statement of the net income of the obligor used to determine the child support obligation, and how that net income was determined." N.D. Admin. Code § 75–02–04.1–02(10). A court must properly find net income when applying the child support guidelines to calculate the correct amount of child support. *Halberg*, 2010 ND 20, ¶ 10, 777 N.W.2d 872. "'Because a proper finding of net income is essential to determine the correct amount of child support under the child support guidelines, we have said that, as a matter

of law, a [district] court must clearly set forth how it arrived at the amount of income and the level of support.'" *Gunia v. Gunia*, 2009 ND 32, ¶ 13, 763 N.W.2d 455 (quoting *Berge v. Berge*, 2006 ND 46, ¶ 8, 710 N.W.2d 417). A district court's decision will be reversed and remanded if the court fails to clearly state how it arrived at the amount of income and the level of support. *Gunia*, at ¶ 13.

[¶ 14] Here, the district court made findings about each party's income and earning ability in deciding whether to award spousal support. But the court did not make specific findings about each party's net income under the child support guidelines. Based on the parties' income tax returns, the court found Ricky Becker's average income from his medical practice is $457,222 per year. The court also found Ricky Becker has an average of $192,000 per year in additional income from consultation and surgical fees. The court found the income from Spa D'Athena in 2009 would be approximately $100,000 based on Ricky Becker's testimony about the business. The court also made findings about the parties' earning abilities. The court considered Ricky Becker's argument that Jill Becker could earn approximately $50,000 per year if she worked full-time as a speech pathologist. But the court found Jill Becker only made $15,000 to $17,000 per year when she worked as a speech pathologist and Jill Becker testified she did not believe she could return to that type of work. The court found, "Jill Becker should earn $100,000 per year from the Spa, and could reasonably earn approximately $15,000 per year from any other employment." The court made these findings as part of its analysis of the *Ruff–Fischer* factors for purposes of deciding whether to award spousal support. *See Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952); *Fischer v. Fischer*, 139 N.W.2d 845

(N.D.1966). However, the court did not make separate findings about each party's net income under the child support guidelines to calculate Jill Becker's child support obligation. The court addressed the parties' arguments about child support and found:

"If Jill Becker were required to pay child support until the children were 19, she would be required to pay for 4 children for 1 year, then 3 children for 2 years, then 2 children for an additional 2 years, and 1 child for the next 2 years.

"Jill Becker has requested that the Court find that Dr. Becker's income is more than three times greater than her income. Therefore, pursuant to N.D.Admin C. § 75–02–04.1–09(8), and 74–02–04.1–09(2)(*l*), the amount due under the child support calculations can be rebutted, and Jill Becker asks that she not be obligated to pay child support in any amount.

"The Court finds that it is important for all members of the family to realize that each parent is making a contribution to the cost of raising the children. By ordering that Jill Becker pay child support, Dr. Becker receives financial support for the children as a recognition of his parenting time and obligations, Jill Becker pays financial support as a recognition of her parental role to support her children, and the children know that both parents are contributing to their financial well being.

"If Jill Becker were to receive income from Spa D'Athena in the approximate amount of $100,000 per year, and spousal support income of $84,000 per year, her child support obligation would be approximately $3,800 for four children, $3,400 for three children, $2,800 for two children and $1,700 for 1 child.

"The Court does finds [sic] that Dr. Becker has a net income of more then three times Jill Becker's income. Therefore, Jill Becker is entitled to rebut the amount of child support due.

"Therefore, the Court orders Jill Becker to pay the sum of $500 per child per month in the form of child support. Pursuant to Section 14–09–08.2(1), N.D.C.C., the duty of support for each child shall continue until the end of the month during which the child is graduated from high school or attains the age of 19 years, whichever occurs first. . . ."

[¶ 15] Although the district court made findings about each party's income and earning ability in deciding whether to award spousal support, it did not make any findings about the parties' net incomes under the child support guidelines. A party's income for purposes of child support may not necessarily be the same as the party's income for purposes of deciding whether to award spousal support. *Cf. Heinz v. Heinz*, 2001 ND 147, ¶ 18, 632 N.W.2d 443 (court erred in calculating child support obligation on income prior to spousal support award, spousal support is income that must be included to determine child support obligation). To determine a child support obligation the court must apply the child support guidelines to calculate the obligor's net income. *Halberg*, 2010 ND 20, ¶ 10, 777 N.W.2d 872. In deciding whether to award spousal support, the court considers the *Ruff–Fischer* factors, which include the parties' earning ability and the needs of the spouse seeking support and the ability of the other spouse to pay. *Duff*, 2010 ND 247, ¶ 14, 792 N.W.2d 916. Under those authorities, a party's earning ability will not necessarily be the same as the party's net income under the child support guidelines.

[¶ 16] The district court did not apply the child support guidelines and make specific findings about each party's net income and how the net income was determined.

*See* N.D. Admin. Code § 75–02–04.1–02(10). To calculate an obligor's net income the court must calculate the obligor's gross income and then subtract the items listed in N.D. Admin. Code § 75–02–04.1–01(7). *Halberg*, 2010 ND 20, ¶ 10, 777 N.W.2d 872. The evidence of Jill Becker's income from Spa D'Athena and the amount of spousal support Jill Becker will receive were gross amounts. The court did not make any findings about Jill Becker's net income under the child support guidelines.

[¶ 17] Furthermore, a court may grant a downward deviation from the presumptively correct guideline amount under N.D. Admin. Code § 75–02–04.1–09(2)(*l*) if the court finds a preponderance of the evidence establishes a deviation is in the children's best interests and if "[t]he reduced needs of the child to support from the obligor in situations where the net income of the obligee is at least three times higher than the net income of the obligor." Section 75–02–04.1–09(8), N.D. Admin. Code, also provides, "[A]ny adjustment shall be made to the child support amount resulting from application of this chapter after taking into consideration the proportion by which the obligee's net income exceeds the obligor's net income." The court must make specific findings for any deviations from the guidelines. *Heinle*, 2010 ND 5, ¶ 37, 777 N.W.2d 590. From this record it is not clear what net incomes the court compared to find Ricky Becker's net income is at least three times higher than Jill Becker's net income. The court did not make a specific finding of Ricky Becker's net income under the child support guidelines, and it is not clear if the court used his average net income from his surgical practice or included the additional income from the surgical and consulting fees.

[¶ 18] We conclude the court erred by failing to find the parties' net incomes for purposes of calculating child support. On remand, the court must find each party's net income applying the child support guidelines and then determine whether Jill Becker is entitled to a downward deviation from the presumptively correct amount of support.

B

[¶ 19] Ricky Becker argues the court should have imputed Jill Becker's income under N.D. Admin. Code § 75–02–04.1–07 because she is unemployed. Although Jill Becker testified she plans to work as a cosmetologist, Ricky Becker contends that her income would be greater if she returned to work as a speech pathologist and that she would not have to work at Spa D'Athena to earn an income from the business because the spa has a manager who runs the business.

[¶ 20] Section 75–02–04.1–07(3), N.D. Admin. Code, provides that a court must impute income to an obligor who is unemployed or underemployed:

"gross income based on earning capacity equal to the greatest of subdivisions a through c, less actual gross earnings, must be imputed to an obligor who is unemployed or underemployed.

a. A monthly amount equal to one hundred sixty-seven times the hourly federal minimum wage.

b. An amount equal to six-tenths of the statewide average earnings for persons with similar work history and occupational qualifications.

c. An amount equal to ninety percent of the obligor's greatest average gross monthly earnings, in any twelve consecutive months beginning on or after twenty-four months before commencement of the proceed-

ing before the court, for which reliable evidence is provided."

[¶ 21] The district court found Jill Becker is not employed, and testimony established Jill Becker has not been employed outside the home since 2003. However, Jill Becker owns Spa D'Athena. Although the business has a manager, Jill Becker testified she would like to go back to school for cosmetology and plans to get more involved in operating the spa. Jill Becker is self-employed and receives income from self-employment under N.D. Admin. Code § 75–02–04.1–01(10), which defines self-employment as:

"employment that results in an obligor earning income from any business organization or entity which the obligor is, to a significant extent, able to directly or indirectly control. For purposes of this chapter, it also includes any activity that generates income from rental property, royalties, business gains, partnerships, trusts, corporations, and any other organization or entity regardless of form and regardless of whether such activity would be considered self-employment activity under the Internal Revenue Code."

Although Jill Becker has the ability to find other employment, she has income from Spa D'Athena and her net income from self-employment must be calculated applying N.D. Admin. Code § 75–02–04.1–05.

[¶ 22] Under N.D. Admin. Code § 75–02–04.1–07(3), a court must impute an obligor's income if the obligor is unemployed, but the court may only impute income if the gross income from earning capacity is more than the obligor's actual gross earnings. Gross earnings include all income, including income from self-employment. *See Halberg*, 2010 ND 20, ¶¶ 16–17, 777 N.W.2d 872. Although the court found Jill Becker is not employed, her actual income from self-employment may be more than

the amount the court could impute under N.D. Admin. Code § 75–02–04.1–07(3)(a)–(c) based on her earning capacity. *Cf. Halberg*, at ¶ 17 ("All other types of income must be added to the net income from self-employment to calculate the obligor's gross income before the court can find an obligor is underemployed."). If, on remand, the district court finds Jill Becker's actual income is less than the amount that could be imputed because she is unemployed, the court should impute her income.

### C

[¶ 23] Ricky Becker also contends Jill Becker's income should be imputed under N.D. Admin. Code § 75–02–04.1–07(10) because she has had a voluntary change in employment. He claims she could make $50,000 per year working full-time as a speech pathologist and she should do that instead of working at the spa.

[¶ 24] An obligor's income may be imputed under N.D. Admin. Code § 75–02–04.1–07(10):

"if an obligor makes a voluntary change in employment resulting in reduction of income, monthly gross income equal to one hundred percent of the obligor's greatest average monthly earnings, in any twelve consecutive months beginning on or after twenty-four months before commencement of the proceeding before the court, for which reliable evidence is provided, less actual monthly gross earnings, may be imputed without a showing that the obligor is unemployed or underemployed. For purposes of this subsection, a voluntary change in employment is a change made for the purpose of reducing the obligor's child support obligation, taking into consideration the obligor's work history, education, health, age, stated reason for

change in employment, likely employment status if the family before the court were intact, and any other relevant factors. The burden of proof is on the obligor to show that the change in employment was not made for the purpose of reducing the obligor's child support obligation."

[¶ 25] Jill Becker does not meet the requirements for imputing her income because of a voluntary change in employment. The court found Jill Becker has not worked as a speech pathologist for "a number of years." Jill Becker testified she could not continue working as a speech pathologist because of her medical condition and because she would have to be recertified. Evidence establishes Jill Becker has not worked outside the home since 2003. She has not changed employment and has not earned any money working outside the home during the twenty-four months prior to commencement of the divorce proceedings. Jill Becker has not voluntarily changed employment.

### IV

[¶ 26] Ricky Becker argues the district court erred in finding Jill Becker was a disadvantaged spouse and awarding her permanent spousal support. He contends any spousal support awarded should have been rehabilitative and of short duration. Ricky Becker claims Jill Becker is voluntarily unemployed, no evidence shows she has any health issues that have interfered in her professional work performance, she could return to work as a speech pathologist, she does not have the responsibility of raising the children and she will receive a substantial income from Spa D'Athena.

[¶ 27] A court may award spousal support under N.D.C.C. § 14–05–24.1, which provides, "[T]aking into consideration the circumstances of the parties, the court may require one party to pay spousal support to the other party for any period of time." "An award of spousal support is a finding of fact that will not be set aside on appeal unless it is clearly erroneous." *Duff*, 2010 ND 247, ¶ 13, 792 N.W.2d 916.

[¶ 28] The words "disadvantaged spouse" may be a handy label but it is not a term of legal significance. *Sack v. Sack*, 2006 ND 57, ¶ 12, 711 N.W.2d 157. Rather, in deciding whether to award spousal support the court must consider the *Ruff–Fischer* guidelines:

> "the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material."

*Duff*, 2010 ND 247, ¶ 14, 792 N.W.2d 916. The court also must consider the needs of the spouse seeking support and the ability of the other spouse to pay. *Duff*, at ¶ 14. The "court is not required to make a finding on each factor, but it must explain its rationale for its determination." *Paulson v. Paulson*, 2010 ND 100, ¶ 9, 783 N.W.2d 262.

[¶ 29] " 'Rehabilitative spousal support is awarded to equalize the burdens of divorce or to restore an economically disadvantaged spouse to independent status by providing a disadvantaged spouse an opportunity to acquire an education, training, work skills, or experience to become self-supporting.' " *Paulson*, 2010 ND 100, ¶ 11, 783 N.W.2d 262 (quoting *Wagner v. Wagner*, 2007 ND 33, ¶ 8, 728 N.W.2d 318). " 'Rehabilitative support

is appropriate when one spouse has bypassed opportunities or lost advantages as a consequence of the marriage or when one spouse has contributed during the marriage to the other's increased earning capacity or moved to further the other's career.'" *Paulson*, at ¶ 11 (quoting *Moilan v. Moilan*, 1999 ND 103, ¶ 11, 598 N.W.2d 81).

[¶ 30] "Permanent spousal support is appropriate 'when the economically disadvantaged spouse cannot be equitably rehabilitated to make up for the opportunities and development lost during the course of the marriage.'" *Duff*, 2010 ND 247, ¶ 15, 792 N.W.2d 916 (quoting *Wagner v. Wagner*, 2007 ND 33, ¶ 8, 728 N.W.2d 318). "[P]ermanent spousal support . . . provide[s] traditional maintenance for a spouse incapable of adequate rehabilitation or self-support." *Duff*, at ¶ 15 (quoting *Wagner*, at ¶ 8). "'Even when a spouse is capable of rehabilitation, permanent spousal support may be an appropriate remedy to ensure the parties equitably share the overall reduction in their separate standards of living.'" *Duff*, at ¶ 15 (quoting *Wold v. Wold*, 2008 ND 14, ¶ 14, 744 N.W.2d 541).

[¶ 31] Here, the district court applied the *Ruff–Fischer* guidelines and made findings about each factor. The court found the parties were married for twenty years and are in their forties. The court found Jill Becker was diagnosed with ADHD and depression which adversely affects her ability to return to her former occupation, while Ricky Becker's earning ability is relatively constant at $455,000 per year and is higher if the additional fees and draws are added. The court found Jill Becker has not worked in speech pathology for a number of years and she does not believe she can return to that work. The court found Jill Becker has the ability to earn $115,000 per year, including $100,000 from Spa D'Athena and $15,000 from other employment. The court found the parties earned a significant marital income and lived accordingly and both parties' expenses are reflective of how they have lived in the past and continue to live. The court also considered Jill Becker's need for support and Ricky Becker's ability to pay spousal support:

"While Jill Becker has a college education and a Master's Degree, she has been out of the work force for most of the twenty year marriage. Dr. Becker encouraged her to be home with the children when they were young, but has encouraged her to go back to work in recent years. Jill Becker has some medical concerns which are controlled by medication. The family has been able to develop a successful, profitable business which Jill Becker now owns, which will bring in income to her, but her income will not come close to the income that Dr. Becker earns.

"Jill Becker has expressed a desire to obtain a cosmetology certification, which she believes will partially rehabilitate her, but the financial benefit from obtaining the degree does not seem to be significant.

"Dr. Becker argues that Jill Becker is capable of earning up to $50,000 as a speech pathologist in addition to the $100,000 or more that he believes she will earn from Spa D'Athena. Even if that were the case, she would be earning $150,000 per year, and he would be earning more than three times that amount. Jill Becker will never be able to match Dr. Becker's earning capacity.

"The Court finds that Jill Becker is a disadvantaged spouse in need of permanent spousal support. The Court also finds that Dr. Becker has the ability to pay permanent spousal support."

[¶ 32]   The evidence in the record supports the court's findings and its decision to award permanent spousal support. Although conflicting evidence existed about Jill Becker's earning ability and whether she has a medical condition affecting her ability to work, "[a] district court's choice 'between two permissible views of conflicting evidence is not clearly erroneous.'" *Pearson v. Pearson*, 2009 ND 154, ¶ 10, 771 N.W.2d 288 (quoting *Barth v. Barth*, 1999 ND 91, ¶ 13, 593 N.W.2d 359). We conclude the court's decision is not induced by an erroneous view of the law because evidence supports it, and we are not convinced, based on the entire record, that a mistake has been made. The court's decision to award permanent spousal support is not clearly erroneous.

## V

[¶ 33]   Ricky Becker argues the court erred by failing to address whether his spousal support obligation would end upon Jill Becker's cohabitation. The court ordered Ricky Becker's spousal support obligation would continue until Jill Becker remarries or dies.

[¶ 34]   We have said cohabitation alone is not a material change in circumstances sufficient to justify a change in spousal support. *Cermak v. Cermak*, 1997 ND 187, ¶ 16, 569 N.W.2d 280. Cohabitation is not treated the same as a remarriage because cohabitants do not have a legal obligation to support each other, the length of the relationship is unknown and the permanent benefits of marriage may be absent. *Id.* at ¶ 10. Terminating spousal support upon cohabitation leaves the recipient with an uncertain means of support because cohabitants do not have any obligation to support each other and no continuing obligation exists. *Id.*

[¶ 35]   The district court did not err by failing to order that the spousal support obligation would end upon Jill Becker's cohabitation.

## VI

[¶ 36]   We conclude the district court's spousal support decision is not clearly erroneous but the court erred as a matter of law in failing to make specific findings about the parties' net incomes and failing to properly apply the child support guidelines to calculate Jill Becker's child support obligation. We affirm the spousal support decision, reverse the child support decision and remand for further proceedings consistent with this opinion.

[¶ 37]   GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.

SANDSTROM, Justice, concurring and dissenting.

[¶ 38]   I agree that this case must be reversed and remanded for the district court to follow the child support guidelines in establishing Jill Becker's child support obligation.

[¶ 39]   I would also reverse the award of spousal support. The majority offers no plausible rationale why, when both parties to this divorce are in their 40s, and when she has a college education and a master's degree, has received substantial property, and is capable of earning $115,000 per year, there should be an award of permanent spousal support.

[¶ 40]   More than four decades ago, in the West Hornbook Series, Professor Clark made the point:

When the English institution of alimony, which served the plain and intelligible purpose of providing support for wives living apart from their husbands, was utilized in America in suits for absolute divorce, however, its purpose be-

came less clear. As a result of absolute divorce the marriage is entirely dissolved. It is harder to justify imposing on the ex-husband a continuing duty to support his former wife than after a divorce a mensa, which does not dissolve the marriage. This difficultly is not obviated by labelling alimony a "substitute" for the wife's right to support. Why should there be such a substitute? Would it not be more logical to say that when the marriage is dissolved all rights and duties based upon it end? Doubts about the wisdom of alimony have also arisen as a result of the married woman's full legal capacity to own and control her own property and more recently as a result of her greater chances for employment.

Homer H. Clark, Jr., *Law of Domestic Relations* 421 (1968).

[¶ 41] Society, through the legislative process, has decided that marriages may end, in essence, for any reason. Absent some compelling reason in a particular case, why, as Professor Clark suggested, "[w]ould it not be more logical to say that when the marriage is dissolved all rights and duties based upon it end?"

[¶ 42] Professor O'Kelly outlined the history of spousal support. Marcia O'Kelly, *Entitlements to Spousal Support After Divorce*, 61 N.D. L.Rev. 225 (1985). Professor O'Kelly explained that historically alimony was a continuation of the husband's duty to support his wife. *Id.* at 235.

> Before 1976, North Dakota cases reflected unqualified acceptance of statutory alimony as the common-law concept of continuation after divorce of the husband's duty to support and maintain his wife during marriage.

*Id.* Professor O'Kelly pointed out that this concept was explicitly endorsed by this Court in *Nugent v. Nugent*, 152

N.W.2d 323, 327 (N.D.1967). O'Kelly, *supra* note 50, at 235.

[¶ 43] But the legal landscape changed in 1971, when the United States Supreme Court, in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), "decided for the first time that the equal protection clause of the Constitution significantly limits the power of government to differentiate treatment, entitlements, or duties on the basis of gender." O'Kelly, *supra*, at 240. Professor O'Kelly explained that the "court correctly recognized the need to replace the old notion of marital support in order to preserve the constitutionality of the alimony statute" when the alimony statute of North Dakota was challenged as impermissibly discriminating against husbands on the basis of sex. *Id.* at 241 (discussing *Bingert v. Bingert*, 247 N.W.2d 464 (N.D.1976)).

[¶ 44] In 1979, the United States Supreme Court held gender-based spousal support violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). In striking down the Alabama law, the United States Supreme Court said, "Appellant views the Alabama alimony statutes as effectively announcing the State's preference for an allocation of family responsibilities under which the wife plays a dependent role, and as seeking for their objective the reinforcement of that model among the State's citizens. We agree, as he urges, that prior cases settle that this purpose cannot sustain the statutes." *Id.* at 279, 99 S.Ct. 1102 (citations omitted).

[¶ 45] The "disadvantaged spouse" doctrine, eviscerated by *Sack v. Sack*, 2006 ND 57, 711 N.W.2d 157, together with the preference for rehabilitative spousal support, had provided at least the semblance of a compelling reason in a particular case.

[¶ 46]   Stereotypes are vicious things. The idea that spousal support is something men pay and women receive cannot be constitutionally sustained.

[¶ 47]   DALE V. SANDSTROM